**Joseph Wayne PALANKI, a Minor by Next Friend and Mother, Michelle Elizabeth PALANKI**

v.

**VANDERBILT UNIVERSITY, et al.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Aug. 18, 2006 Session.

Nov. 13, 2006.

Todd A. Rose, Paris, Tennessee; Les Jones, Memphis, Tennessee; Rosella M. Shackelford, Clarksville, Tennessee, for the appellant, Joseph Wayne Palanki, a Minor by Next Friend and Mother, Michelle Elizabeth Palanki.

Andree Sophia Blumstein, Steven D. Hurd, Steven E. Anderson, Sara F. Reynolds, Nashville, Tennessee, for the appellee, Vanderbilt University.

## OPINION

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Minor, through mother and next friend, filed a medical malpractice action against hospital for the admittedly negligent removal of ninety percent of the minor's bladder. The jury rendered a verdict in favor of Plaintiff for $16,000,000.00. The trial court suggested a remittitur that reduced the amount of Plaintiff's judgment to $6,500,000.00. Plaintiff accepted the remittitur under protest and filed the instant appeal, seeking a reinstatement of the jury's verdict and prejudgment interest. The hospital cross-appealed seeking an increase in the trial court's suggested remittitur, arguing that the judgment was excessive in light of other medical negligence actions and that the trial court erred in admitting testimony about improbable risks of medical complications as a result of infant's injuries and admitting evidence of pre-majority medical expenses. The decision of the trial court is affirmed in all respects.

Joseph Palanki was born without complication on February 8, 1999, to Ms. Michelle Craig. His pediatrician described him as a healthy child during his first eleven months. In December 1999, Ms. Craig took Joseph to visit Dr. John Pope, a pediatric urologist at Vanderbilt, for treatment of a condition known as a hydroceles. On January 20, 2000, Dr. Pope was scheduled to perform outpatient surgery on Joseph in order to correct the hydroceles. However during the procedure, Dr. Pope removed ninety percent of Joseph's bladder.

On January 22, 2000, Dr. Pope attempted to repair Joseph's bladder by closing the remaining bladder tissue. On February 18, 2000, Joseph underwent another surgery at Vanderbilt to augment his bladder in which a cross-section of Joseph's large intestine, small intestine, and appendix, were sewn to the remaining portion of Joseph's bladder. In addition, Dr. Pope attached Joseph's appendix to his belly button in order to form a tube running from his bladder to his belly button. The tube, known as the Mitrofanoff Channel, now provides a catheter access to Joseph's bladder in order to drain urine from the bladder.

Following the two corrective surgeries, Joseph experienced chronic urinary tract infections and a failure to thrive. His pediatrician attributed his low weight to his body's need to use digested calories to fight his chronic urinary tract infections rather than using the calories to grow. Since January 20, 2000, Joseph has been unable to urinate spontaneously and must void by catheterization through a permanent opening in his navel. Joseph has also experienced kidney reflux which involves the urine moving backwards from the bladder to the kidneys. In order to combat the complications resulting from his condition, Joseph has taken prescription medications everyday since his injury on January 20, 2000. His prescriptions have included Bactrim, Macrodantin, and Gentamicin to prevent infections and Ditropan for kidney reflux.

Joseph, through his mother and next friend, filed the instant action against Vanderbilt on January 16, 2003. Although Vanderbilt admitted vicarious liability and did not seriously contest the negligence of Dr. Pope, the amount of damages was disputed. On May 18, 2005, the jury rendered a verdict in favor of Plaintiff in the amount of $16,400,000.00. The verdict included $300,000.00 for medical expenses until the age of eighteen, $1,100,000.00 for medical expenses after the age of eighteen, and $15,000,000.00 in non-economic dam-

ages. The trial court directed Plaintiff to draw the judgment for $16,0000,000.00, the amount sought in the complaint.

On August 15, 2005, the trial court denied Defendant's motion for a new trial but suggested a remittitur that reduced Plaintiff's award to $6,500,000.00. The court also denied Plaintiff's motion for prejudgment interest. Plaintiff accepted the remittitur under protest and filed this notice of appeal seeking a reinstatement of the jury's verdict and prejudgment interest. Defendant cross-appeals claiming that the amount of remittitur suggested by the trial court should be increased because (1) the verdict is excessive when compared with other medical negligence cases; (2) the trial court erred in admitting testimony about improbable risks of medical complications; and (3) the trial court erred in admitting evidence of pre-majority medical expenses.

## I. REMITTITUR

The remittitur statute contained in Tennessee Code Annotated section 20–10–102(b) provides the standard of review for a trial court's suggestion of remittitur. The statute states:

The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in Rule 13(d) of the Tennessee Rules of Appellate Procedure applicable to decisions of the trial court sitting without a jury. If, in the opinion of the court of appeals, the verdict of the jury should not have been reduced, but the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment shall be rendered in the court of appeals for the full amount originally awarded by the jury in the trial court.

Tenn.Code Ann. § 20–10–102(b).

According to Tennessee Rule of Appellate Procedure 13(d), "review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." However, conclusions of law are not afforded the same presumption. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744–45 (Tenn.2002).

■ The primary issue on appeal concerns whether the trial court erred in suggesting a remittitur which reduced Plaintiff's verdict from $16,000,000.00 to $6,500,000.00. We first note that:

[A]ppellate courts customarily conduct a three-step review of a trial court's adjustment of a jury's damage award. First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. *Burlison v. Rose*, 701 S.W.2d [609] at 611 [ (Tenn.1985) ]. Second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d [142] at 148 [ (Tenn.1981) ]; *Guess v. Maury*, 726 S.W.2d 906, 913 (Tenn.Ct. App.1986). Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment. *See* Tenn.Code Ann. § 20–10–102(b).

*Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn.Ct.App.1990).

By order dated August 15, 2005, the trial court clearly disagreed with the amount of the judgment rendered by the jury and reduced such amount accordingly. Said the court:

Having weighed the evidence in support of all the categories of damages to which Plaintiff was legally entitled, *see Over-*

*street v. Shoney's Inc.,* 4 S.W.3d 694 (Tenn.Ct.App.1999), having determined that the award of medical expenses was excessive, and having determined that the evidence on both economic and non-economic damages was insufficient to support the award of $16,000,000.00, the Court suggests a remittitur of the judgment in the amount of $9,500,000.00, thereby resulting in a judgment of $6,500,000.00 in favor of Plaintiff.

We also note that Plaintiff does not contend on appeal that the amount of the remittitur "totally destroys" the jury's verdict and we cannot make such a finding here. Therefore, we will now review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.

In a civil jury trial, the trial court acts as the thirteenth juror and therefore may set aside a jury's verdict and order a new trial when justice so requires. *James E. Strates Shows, Inc. v. Jakobik,* 554 S.W.2d 613, 616 (Tenn.1977). Alternatively, the court may suggest a remittitur of the jury award, Tenn.Code Ann. § 20–10–102(a), to correct an excessive jury verdict without the time and expense of a new trial. *Hunter v. Ura,* 163 S.W.3d 686, 705 (Tenn.2005). Although the amount of an award is primarily a consideration for the jury to determine, the trial court may suggest a remittitur when the amount of the verdict is excessive, beyond the range of reasonableness, or is excessive as the result of passion, prejudice, or caprice. *Poole v. Kroger Co.,* 604 S.W.2d 52, 54 (Tenn.1980). However, there is no precise mathematical formula which the court can use to assure that judgments in negligence cases are uniform. *S. Ry. Co. v. Sloan,* 56 Tenn.App. 380, 407 S.W.2d 205, 211 (1965). Said the Court:

There is no exact yardstick, or measurement, which this court may use as a guide to determine the size of verdicts which should be permitted to stand in cases of this kind. Each case must depend upon its own facts and the test to be applied by us is not what the amount the members of the court would have awarded had they been on the jury, or what they, as an appellate court, think should have been awarded, but whether the verdict is patently excessive. The amount of damages awarded in similar cases is persuasive but not conclusive, and, in evaluating the award in other cases, we should note the date of the award, and take into consideration inflation and the reduced value of the individual dollar.

*S. Ry. Co.,* 407 S.W.2d at 211.

The standard of review applicable on appeal in cases where the trial judge has suggested a remittitur (or an additur) has been the subject of diverse appellate opinions. This problem is discussed at length by the Supreme Court in *Smith v. Shelton,* 569 S.W.2d 421 (Tenn.1978). As *Smith* reveals, older decisions applied an abuse of discretion standard, and later cases adopted a *de novo* review standard. 569 S.W.2d at 423. In *Speight v. Newport,* 503 S.W.2d 202, 205 (Tenn.Ct.App.1973), the Court of Appeals reviewed the trial court's additur suggestion pursuant to then Tennessee Code Annotated section 27–303, which was applicable to trials without the intervention of a jury, using a *de novo* review with a presumption of correctness of the trial court's findings. *Speight* was specifically overruled in *Smith,* but nine years later, the legislature of Tennessee enacted Chapter 232 of the Public Acts of 1987 wherein Tennessee Rule of Appellate Procedure 13(d) was legislatively inter-

posed to reinstate the rule in *Speight*.[1]

Thus, the presently existing standard of review is that provided by Tennessee Rule of Appellate Procedure 13(d) wherein the factual findings of the trial judge are presumed to be correct unless the evidence in the record preponderates against such factual findings.

▆▆▆ A trial judge is authorized under Tennessee law to grant a remittitur if that trial judge determines that the verdict of the jury is excessive. *Poole*, 604 S.W.2d at 54. It is not necessary that the trial judge find that the verdict of the jury is tainted by corruption or that the jury was influenced by "passion, prejudice or caprice." *Jenkins v. Commodore Corp. S.*, 584 S.W.2d 773, 778 (Tenn.1979).

In *Ala. Great S. R. Co. v. Roberts*, 113 Tenn. 488, 82 S.W. 314 (Tenn.1904), the Supreme Court discussed at length the circumstances under which a remittitur might be granted, and in summing up those holdings in a later opinion, the Supreme Court held:

> In short, *Roberts* held that trial courts had the authority to use remittiturs to cure excessive jury verdicts (1) where the verdict was merely excessive or (2) where it was so excessive that it evinced passion, prejudice or caprice, and it also affirmed the trial judge's option to simply order a new trial without suggesting a remittitur, if he found the verdict so excessive as to evince passion, prejudice or caprice.

*Pitts v. Exxon Corp.*, 596 S.W.2d 830, 833 (Tenn.1980).

There is no assertion in the case at bar that the verdict is tainted by corruption of the jury, but merely that it is excessive. Confronted with a situation analogous to the case at bar, the Supreme Court held:

Therefore, from our examination of this record, any emotion in the minds of the jurors legitimately and naturally flowed from the tragic facts of the case or from tactics employed by counsel for the defense and cannot be categorized as improper or unjustified. It is not every "passion" or emotion which is tantamount to jury misconduct. As stated by this Court many years ago, in the case of *Reeves v. Catignani*, 157 Tenn. 173, 176, 7 S.W.2d 38, 39 (1928):

> "The right to revise even the amount of the verdict by the process of suggesting a *remittitur* is a delicate one and one that a court should be slow to adopt; and if it should appear that there was in the verdict an element of actual corruption, we think the proper course would be to set it aside. The words 'passion, prejudice or caprice' indicate that the jury was, in the opinion of the court, swayed to a more or less extent by their feelings, which after all are human and are not inconsistent with an honest intention, while, on the other hand, a verdict that is infected with the corruption of one or more of the jurors is to that degree a dishonest verdict."

*Jenkins*, 584 S.W.2d at 778.

▆▆▆ In this case, we believe that the evidence does not preponderate against the trial court's suggestion of remittitur. With respect to economic damages, Plaintiff's expert economist, Dr. Ralph Scott, testified that Plaintiff would incur pre-majority medical expenses in the amount of $154,952.35 and post-majority medical expenses in the amount of $262,480.59. However, the jury awarded Plaintiff $300,000.00 for pre-majority medical expenses and $1,100,000.00 for post-majority

---

1. Chapter 232 of the Public Acts of 1987 was codified as Tennessee Code Annotated section 20–10–101(b)(2) and as Tennessee Code Annotated section 20–10–102(b).

expenses. Plaintiff argues that a jury may consider "inflation, the high cost of living, and the impaired purchasing power of money" when deciding the amount of damages, *Waller v. Skeleton*, 31 Tenn.App. 103, 212 S.W.2d 690, 698 (1948), and that the difference in the amount of economic damages proven and the amount of economic damages awarded in this case was a result of this consideration. Although Plaintiff correctly asserts that a jury may consider inflation, Dr. Scott testified that inflation was accounted for when he made his calculations. Because we can find no basis in the record for the discrepancy in the amount of economic damages proven and economic damages awarded, we find that the evidence of economic damages does not preponderate against the trial court's suggestion of remittitur.

We also believe that the evidence of non-economic damages does not preponderate against the trial court's suggestion of remittitur. Non-economic damages include "pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life—both past and future." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 715 (Tenn.Ct.App.1999). Damages for pain and suffering include both the physical and mental discomfort caused by an injury. *Overstreet*, 4 S.W.3d at 715. In this case, Defendant does not dispute that Plaintiff is entitled to be compensated for the pain and suffering which he incurred as a result of Dr. Pope's negligence. Plaintiff's physical injuries include the negligent removal of ninety percent of his bladder, two additional surgeries, chronic urinary tract infections, kidney reflux, extensive testing, and daily medication. However, it appears from the record that Plaintiff will experience little ongoing physical pain as a result of Dr. Pope's negligence. Mrs. Craig testified at trial that the daily catheterizations which Plaintiff would experience were painless. Damages for pain and suffering also include a " 'wide variety of mental and emotional responses' that accompany the pain, characterized as suffering, such as anguish, distress, fear, humiliation, grief, shame, or worry." *Overstreet*, 4 S.W.3d at 715 (internal citations omitted). Although we can only surmise the psychological impact of Plaintiff's injuries, Plaintiff's psychological expert, Dr. Thomas Burns, testified that if future psychological issues arose, the issues could be managed in six to twelve counseling sessions. Plaintiff's expert physician, Dr. Curtis Sheldon, also testified that catheterized patients tend to do very well from a psychiatric perspective.

Permanent injuries are injuries "from which the plaintiff cannot completely recover." *Overstreet*, 4 S.W.3d at 715. A permanent injury "prevents a person from living his or her life in comfort by adding inconvenience or loss of physical vigor." *Overstreet*, 4 S.W.3d at 715. "Disfigurement is a specific type of permanent injury that impairs a plaintiff's beauty, symmetry, or appearance." *Overstreet*, 4 S.W.3d at 715. Here, the removal and augmentation of Plaintiff's bladder is clearly a permanent injury. There is little likelihood that Plaintiff will ever urinate spontaneously and therefore he must continue to void by self-catheterization through a permanent opening in his navel. This injury also affects Plaintiff's appearance in that a stoma site has replaced his belly button so that a catheter may enter his body. Although the stoma site is easily hidden beneath a shirt, any activity which causes Plaintiff to remove his shirt will provide visual access of the disfigurement.

Finally, "[d]amages for loss of enjoyment of life compensate the injured person for the limitations placed on his or

her ability to enjoy the pleasures and amenities of life." *Overstreet,* 4 S.W.3d at 715–16. "This type of damage relates to daily life activities that are common to most people." *Overstreet,* 4 S.W.3d at 716. It is undisputed that Plaintiff's injuries will not prevent him from engaging in normal life activities, with the exception of heavy contact sports. Specifically, Dr. Sheldon testified that the injuries would not inhibit Joseph from having friends, getting married, having a normal sex life, fathering children, receiving an education, or earning a living. Mrs. Craig claims that Plaintiff's injuries have deprived him of the opportunity to attend public school, and that instead, Plaintiff must be home-schooled. However, it is clear from Mrs. Craig's testimony that the decision to home-school Plaintiff was voluntary and not based entirely on his injuries but rather in an effort to adhere to her religious convictions.

"The role of the appellate courts is to determine whether the trial court's adjustments were justified, giving due credit to the jury's decision regarding the credibility of the witnesses and due deference to the trial court's prerogatives as thirteenth juror." *Long,* 797 S.W.2d at 896. A trial court's remittitur must be upheld unless the remittitur is contrary to the preponderance of the evidence. *McCollum v. Huffstutter,* No. M2002–00051–COA–R3–CV, 2002 WL 31247077, at *10 (Tenn.Ct.App. Oct. 8, 2002). After analyzing the injuries incurred and the judgment awarded in this matter, we believe that the trial court's suggestion of remittitur is clearly within the range of reasonableness and supported by a preponderance of the evidence.

## II. PREJUDGMENT INTEREST

Plaintiff also contends that the trial court erred in refusing to award pre-judgment interest. The question of whether prejudgment interest should be awarded rests within the sound discretion of the trial court, *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn.1998), and will not be disturbed on appeal absent an abuse of discretion. *Spencer v. A–1 Crane Serv., Inc.,* 880 S.W.2d 938, 944 (Tenn. 1994). "While Tennessee law permits the award of prejudgment interest in certain instances, *see* Tenn.Code Ann. § 47–14–123 (2005), an award of prejudgment interest in a personal injury action by negligence is not allowed." *King v. Gen. Motors Corp.,* No. M2004–00616–COA–R3–CV, 2005 WL 3508016, at *7 (Tenn.Ct.App. Dec. 22, 2005); *see also McKinley v. Simha,* No. W2001–02647–COA–R3–CV, 2002 WL 31895715, at *22 (Tenn.Ct.App. Dec. 31, 2002). The Tennessee Supreme Court explained the rationale behind this disallowance in *Louisville & N. R. Co. v. Wallace,* 91 Tenn. 35, 17 S.W. 882, 882–83 (1891). Said the Court:

> This involves a consideration of the question, what is the true measure of damages for such personal injury? The rule for determining damages for injuries not resulting in death, (where the statute fixes the measure,) and not calling for exemplary punishment, deducible from the decisions of this court since its organization in this state, is that of compensation for mental suffering and physical pain, loss of time, and expenses incident to the injury, and, if it be permanent, the loss resulting from complete or partial disability in health, mind, or person thereby occasioned. And this is the rule most consonant to reason adopted in other states. 3 Sedg. Dam. (8th Ed.) § 481 et seq.; 5 Amer. & Eng. Enc. Law, pp. 40–44, and notes; *Railroad Co. v. Read,* 87 Amer. Dec. 260 [37 Ill. 484]. As this sum in gross includes all the compensation which is requisite to cover pain, suffering, and

disability to date of judgment, and prospectively beyond, it is intended to be and is the full measure of recovery, and cannot be supplemented by the new element of damages for the detention of this sum from the date of the injury. The measure of damages being thus fixed, it is expected that in determining it juries and courts will make the sum given in gross a fair and just compensation, and one in full of amount proper to be given when rendered, whether soon or late after the injury; as, if given soon, it looks to continuing suffering and disability, just as, when given late, it includes that of the past. It is obvious that damages could not be given for pain and suffering and disability experienced on the very day of trial, and then interest added for years before. These are items considered to make up the aggregate then due, and the gross sum then for the first time judicially ascertained.

*Louisville & N.R. Co.,* 17 S.W. at 882–83.

The trial judge in this case had serious questions as to his authority to grant prejudgment interest in a personal injury case. To the extent that controlling law might allow him discretion as to prejudgment interest, he made it clear that in the exercise of such discretion he would not grant prejudgment interest. Unless, and until, the Tennessee Supreme Court alters the rule in *Hollis v. Doerflinger,* 137 S.W.3d 625, 630 (Tenn.Ct.App.2003), which it declined to do in *Francois v. Willis,* 205 S.W.3d 915, 916–17 (Tenn.Ct.App.2006), *perm. app. denied* (Tenn. Sept. 25, 2006), prejudgment interest is not recoverable in a personal injury action. Accordingly, we cannot find that the trial court erred in refusing to award prejudgment interest.

### III. INCREASE IN REMITTITUR

■ Defendant contends on appeal that the amount of remittitur suggested by the trial court should be increased. According to Defendant, Plaintiff's award should be reduced to somewhere between $900,000.00 and $1,600,000.00 in order to bring the judgment within the range of reasonableness in light of comparable negligence cases. However, as the court noted in *S. Ry. Co.,* "[t]he amount of damages awarded in similar cases is persuasive but not conclusive, and, in evaluating the award in other cases, we should note the date of the award, and take into consideration inflation and the reduced value of the individual dollar." 407 S.W.2d at 211. Upon a review of the record we find that the evidence does not preponderate against the amount of the trial court's remittitur suggestion.

■ Defendant also argues that the trial court erred in admitting allegedly inadmissible and prejudicial testimony and that such error supports an increase in the amount of remittitur suggested by the trial court. According to Defendant, Dr. Sheldon testified as to certain risks of medical complications that are unlikely to occur as a result of Dr. Pope's negligence and that the inadmissible testimony evoked passion, prejudice and caprice on behalf of the jury. We review decisions concerning the admission or exclusion of evidence under an abuse of discretion standard. *Mercer,* 134 S.W.3d at 131. Dr. Sheldon testified:

Q. Doctor, is there—or do you know of a reason why patients with augmented bladders have an increased risk of cancer?

A. You know, the real answer is no. There have been experimental models that have been created where basically—one thing we know is if we put urine into the intestinal tract that there is a substantial incidence of malignancy. Now, in our population of patients thus far, we have

not had a malignancy develop. I have had variations of this type of reconstruction, like what we call ureterosigmoidostomy which is where you out urine into an intact valve where they have created malignancy and I have treated those patients. And there are experimental models based on that that seem to have indicated that there's certain metabolic changes that can occur that makes the animal at increased risk of malignant or premalignant changes. In the setting of this particular surgical preparation, I don't know that anyone really has a specific scientific answer for the exact etiology of this, it's more of a clinical observation.

Q. Do you see a risk as serious enough to require lifelong testing?

A. Oh yes, without a question. Now, there may be things—some things like psychology that may come to play a role. And that would be helpful. It's awfully hard to come up with good therapeutic guidelines for things that—where the—the numerator and the denominator, we're talking about such small numbers and such a long-term follow-up, it's hard to get a handle on exactly what the risk is going to be, but I don't think that anyone has any question but that surveillance cystoscopy is warranted in these patients. I'm not aware of anyone who's made an argument against that.

Defendant argues that because Plaintiff's injuries admittedly pose little risk of causing cancer, testimony about this medical risk was inadmissible. *See Hunter*, 163 S.W.3d at 703–04. However, Plaintiff contends that Dr. Sheldon's testimony was admitted solely to show the necessity of a yearly cystoscopy examination as a preventative measure due to the increased risk of cancer in bladder augmentation patients.

 The parties agree that the cost of future testing is a compensable element of Plaintiff's damages. In order to establish a claim for future medical expenses, plaintiff must show that additional medical treatment is "reasonably certain to be required in the future." *Henley v. Amacher*, No. M1999–02799–COA–R3–CV, 2002 WL 100402, at *14 (Tenn.Ct.App. Jan. 28, 2002) (quoting T.P.I. 3—Civil 14.11). "This 'reasonable certainty' standard requires more than a mere likelihood or possibility." *Henley*, 2002 WL 100402, at *14. "It requires the plaintiff to establish with some degree of certainty that he or she will undergo future medical treatment for the injuries caused by the defendant's negligence." *Henley*, 2002 WL 100402, at *14. "[T]he 'reasonable certainty' standard requires the plaintiff to prove that he or she will, more probably than not, need these medical services in the future." *Henley*, 2002 WL 100402, at *14.

Because Plaintiff had the burden of showing that the yearly cystoscopy examination was reasonably certain to be required in the future and because Dr. Sheldon's testimony showed the importance and necessity of the future medical examinations, we can find no error in the admission of this testimony. Furthermore, the trial court's jury charge rendered any prejudice which may have resulted from Dr. Sheldon's testimony harmless. The charge provided:

In determining damages in this case, you may not award damages for medical conditions that might develop in the future as a result of the damaged bladder, nor may you award damages for the fear of development of any possible future medical conditions. This does not pre-

clude damages for necessary future medical testing.

■ Defendant alleges that the trial court erroneously admitted portions of Dr. Sheldon's deposition testimony which addressed improbable risks of medical complications but did not support Plaintiff's claim for future testing. Defendant claims the trial court's admission was erroneous because in a medical malpractice case, experts may only testify as to what is medically probable not merely what is medically possible. *See Hunter,* 163 S.W.3d at 703–04. Dr. Sheldon testified:

Q. Okay. And this—and to your knowledge, this injury will have little or no impact on his life expectancy, correct?

A. You know, I don't know how you answer that. You know, I can give you a list of several life-threatening things that he's at increased risk for. Whether we're able to—I mean he's got—gosh, he's got sixty years ahead of him, you know, to deal with these risks. I don't know how someone answers that question. He's got risk to his kidneys. He's got an increased risk of malignancy. He's got issues that can be life-threatening and, you know, I think in general we do a pretty good job, but what you won't find is someone who's had this surgery and is now seventy-two. You're not going to find those patients out there and see—you can't find a hundred of them to see how they did.

■ This testimony was elicited from Dr. Sheldon on cross-examination by counsel for Defendant. By his question, Defendant's counsel sought to establish that the injury would have no impact on the life expectancy of Plaintiff. The answer of Dr. Sheldon was responsive, though not in the "yes or no" manner posed by the question.

The rule is long settled in Tennessee and is apparently universal that a party cannot generally be heard to complain about testimony elicited by his own cross-examination of an opposing party or a witness. *Bakery Servs., Inc. v. Thornton Chevrolet, Inc.,* 224 Ga.App. 31, 479 S.E.2d 363, 365 (1996), *Doucette v. Doucette,* 168 Vt. 626, 725 A.2d 901, 904 (1998), *Dorfman v. Schwabl,* 777 So.2d 427, 429–30 (Fla.Dist.Ct.App.2000). The Supreme Court has held:

It was assigned as error that the Court, over the objection of defendant's counsel, permitted the plaintiff to testify in regard to a rent contract which was a wholly independent matter, and said contract, if admissible, being in writing, it should have been produced.

In answer to this assignment of error it may be stated that this evidence was brought out by defendant's counsel in his cross-examination of plaintiff. Not one word was said about it in the original examination.

*Cartwright v. Smith,* 104 Tenn. 688, 58 S.W. 331, 332 (Tenn.1900).

■ The rule is based upon the general principle that a party cannot take advantage of errors which that party has induced or invited. *Gentry v. Betty Lou Bakeries,* 171 Tenn. 20, 100 S.W.2d 230, 231 (1937).

On this type of issue, the Court of Civil Appeals of Texas long ago held:

The questions and answers are as follows: "Q. Are you willing to state that the witnesses Brockman, Dashield, Glass, and Martin swore that the diagram was lost? A. I really have no recollection of the four of them. Q. That is your answer? A. My recollection is that two of the conductors did." Thus it is seen that the assignment presents the absurdity of predicating error upon answers made to questions propounded by

the party complaining of them, and of asking a reversal of the judgment because the answers were not categorical, when it is apparent that the questions could not have been answered "Yes" or "No," and were of such nature that the witness could only answer from his recollection.

*Pullman Co. v. Vanderhoeven,* 48 Tex.Civ. App. 414, 107 S.W. 147, 150 (1908).

In a similar context, the Court of Appeals of Georgia held:

> In *Scott v. State,* 57 Ga.App. 187(1), 194 S.E. 844, this court said: "The ground of the motion for new trial, complaining of the admission of certain testimony of a witness for the State, is without merit, since the ground discloses that the testimony was elicited from the witness (presumably, on cross-examination) by counsel for the *movant.* Where counsel on the cross-examination of a witness takes a chance by propounding a dangerous question, he will not be heard to object to the answer, no matter how prejudicial it may be, if the answer is a direct and pertinent response to the question." *See also Brown v. Wilson,* 55 Ga.App. 262(2), 189 S.E. 860; *Foster v. State,* 72 Ga.App. 237(2), 33 S.E.2d 598; and *Anderson v. Brown,* 72 Ga. 713, 714(8).

*Gaddy v. State,* 96 Ga.App. 344, 99 S.E.2d 837, 838 (1957).

A later restatement of this rule by the Court of Appeals of Georgia occurred in *Volkswagen of Am., Inc. v. Gentry,* 254 Ga.App. 888, 564 S.E.2d 733 (2002). Said the Court:

> [W]e note that at least some of the evidence to which Volkswagen now objects was elicited by its own counsel on cross-examination. For example, William Muzzy, the Gentrys' engineering expert, testified during direct examination that a number of design changes in the VWRA system might have saved

Lori Gentry's life. Included among these suggestions was the addition of a "lap strap." The Gentrys' counsel then addressed the other factors, but did not elicit further testimony regarding a lap belt. On cross-examination, however, Volkswagen's counsel elicited an opinion from Muzzy that all two-point passive restraint systems were defective and worked to elicit an opinion that the only way to make them nondefective was to add a lap belt. This cross-examination went beyond the Gentrys' position, venturing into the area prohibited by *Gentry I.* Volkswagen cannot claim error from evidence it elicited during its own cross-examination. *See generally Moody v. Dykes,* 269 Ga. 217, 220(3), 496 S.E.2d 907 (1998) (a party cannot induce error and then benefit from it).

*Volkswagen of Am., Inc.,* 564 S.E.2d at 738.

The same rule is stated by the Ohio Court of Appeals in *Rhodes v. Rhodes Indus., Inc.,* 71 Ohio App.3d 797, 595 N.E.2d 441 (1991). Said the Court:

> Appellant also alleges that the trial court impermissibly allowed Douglas Albers to explain the term "consultant" to include salesman, goodwill ambassador, cheerleader and manager. However, we must point out that it was appellant who elicited this testimony from Douglas Albers on cross-examination. Therefore, appellant's assignment of error objecting to the admission of parol testimony concerning Douglas Albers' explanation of the term "consultant" is an invited error for which appellant cannot now complain. Under the "invited error" doctrine, "[a] party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *Center Ridge Ganley, Inc. v.*

*Stinn* (1987), 31 Ohio St.3d 310, 313, 31 OBR 587, 590, 511 N.E.2d 106, 108.

*Rhodes,* 595 N.E.2d at 446–47.

We therefore find that the trial court did not err in refusing to strike the testimony of Dr. Sheldon.

## IV. PRE-MAJORITY MEDICAL EXPENSES

▮ As a final matter, Defendant contends that the trial court erred in admitting evidence of Plaintiff's pre-majority medical expenses since a minor does not having standing to assert a claim for expenses incurred on his behalf and Mrs. Craig was not a party to the suit. Tennessee Code Annotated section 20–1–105 provides that a claim for medical expenses incurred by a minor during his or her minority does not belong to the minor, but rather to the minor's parents. *See also Burke v. Ellis,* 105 Tenn. 702, 58 S.W. 855, 857 (1900). However, in *Smith v. King,* No. Civ.A. 958, 1984 WL 586817, at *2 (Tenn.Ct.App. Sept. 21, 1984), the court addressed a substantially similar issue and determined that a minor plaintiff may maintain his or her own cause of action for medical expenses and include the amount of medical expenses incurred on behalf of the minor as an element of his or her damages.

In *Smith,* Barbara Ellen Smith, a minor, by and through her parents as next friends, sued defendant for personal injuries received when the school bus in which she was a passenger was struck by defendant's vehicle. *Smith,* 1984 WL 586817, at *1. Because the suit was filed more than a year after the accident, the parent's cause of action for pre-majority medical expenses was barred by the statute of limitations. *Smith,* 1984 WL 586817, at *1. Instead of precluding any recovery for the minor's pre-majority medical expenses, the court adopted the waiver rule and held

that "a child under circumstances where the parent has acted as next friend may maintain an action for his medical expenses provided that [the parent] has paid for them ... or is legally obligated to pay them." *Smith,* 1984 WL 586817, at *2. The court reasoned that pursuant to the waiver rule, "the parent by bringing the suit on behalf of the minor has waived any claim that he might have" thereby eliminating the concern of double recoveries for pre-majority medical expenses. *Smith,* 1984 WL 586817, at *2.

Applying the holding in *Smith,* we find that Plaintiff could properly maintain his own action for pre-majority medical expenses incurred or likely to be incurred by Mrs. Craig on his behalf and thus the trial court did not err in admitting evidence of Plaintiff's pre-majority medical expenses. Since the jury awarded Plaintiff $300,000.00 in pre-majority economic damages, Mrs. Craig is precluded from any further individual recovery under the waiver rule enunciated in *Smith.*

## V. CONCLUSION

▮ The trial court, the parties and the jury faced a human tragedy of epic proportions in this case. A healthy eleven-month-old child entered a medical facility for outpatient correction of a relatively minor problem. By error based upon proximate negligence, which is not contested, the doctor removed ninety percent (90%) of the boy's bladder. While heroic and innovative measures were taken to remedy the injury and restore quality of life to the infant, great damage had been done to the child which could not be remedied. It was Omar Khayyam's admonition that "The Moving Finger writes; and, having writ, Moves on: nor all thy Piety nor Wit Shall lure it back to cancel

half a Line, Nor all thy Tears wash out a Word of it." Edward Fitzgerald, *The Rubaiyat of Omar Khayyam* (1859). One cannot consider the record in this case without feeling the strong emotional pull and acknowledging that no amount of money would be sufficient for any parent to allow such an injury to be visited upon his or her child. Even in granting the remittitur in this case, the trial judge observed:

> I also might mention, though, I mean I still consider the injury—I mean the—this is a case of a terrible tragedy. I guess we call it a medical accident in terms of the law, medical malpractice which was admitted. And I don't want to undervalue the damages to this young man. And in the defendant's brief, I think they concentrate too much on the physical pain. And I want to make reference to the discussion by Judge Koch in Overstreet versus Shoney's at 4 southwest second specifically at Page 715 where Judge Koch discusses in detail pain and suffering and what that means; loss of enjoyment of life, what that means; permanent injury and what that means, all of which can be taken into consideration by the judge.

> It's a difficult decision in weighing this matter....

While there is no statutory limit on the amount of damages that may be awarded, there must of necessity be some limit on damages allowed, and it is the duty of both the trial judge and the appellate courts to be certain that just limits are not exceeded. *Garis v. Eberling,* 18 Tenn.App. 1, 71 S.W.2d 215, 231 (1934).

The system of trial by jury remains the best fact-finding process ever conceived in the genius of the human mind, but trial and appellate courts must exercise the duties imposed upon them by law.

Juries intend to be both just and reasonable but often inexperienced in the trial of such questions, excited inclinations of pity for those suffering, and sympathy with present distress, which does so much honor to our better nature under other circumstances, and so much to defeat the course of justice when operating to obscure the judgment in so serious a situation as the trial of any issues of human rights, combine to bring them to conclusions which are inconsistent with law and justice; and in such cases the court should always interpose, and preserve the rights of the parties under his more experienced and dispassionate apprehension of the law.

*Louisville N.R. Co. v. Stacker,* 86 Tenn. 343, 6 S.W. 737, 741 (Tenn.1887).

The simple fact is that monetary damages are a totally inadequate remedy for the kind of injury involved in this case, but such is the only remedy available at law, and the learned trial judge has performed his sworn duty. The record before this Court mandates that we affirm the action of the trial judge because the evidence certainly does not preponderate against his decision.

Costs of appeal are assessed in equal shares to the parties, and the case is remanded to the trial court for such further proceedings as may be necessary.