IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 14, 2024 Session

## MORGAN ASHLEE HOOD v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. T20192623-1          William A. Young, Commissioner**

_____

**No. E2023-00773-COA-R3-CV**

_____

This appeal involves a decision by the Tennessee Claims Commission ("the Commission") awarding damages to the claimant for her injuries caused by the negligence of a state employee. The Commission determined that an employee of the University of Tennessee at Knoxville had created a dangerous condition by leaving a wet tile floor in a dormitory bathroom and failing to warn the claimant, who was a resident of the dormitory room, of the condition. The Commission found that the state employee's negligence had caused the claimant to fall and break her arm, thereby also causing her to incur medical expenses and other damages. The Commission awarded damages to the claimant and against the State of Tennessee ("the State") in the amount of $187,398.23. The State has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Joshua R. Walker, Knoxville, Tennessee, for the appellant, State of Tennessee.

Alisha M. Toll, Goodlettsville, Tennessee, for the appellee, Morgan Ashlee Hood.

**OPINION**

I. Factual and Procedural Background

On October 16, 2019, the claimant, Morgan Ashlee Hood, filed a complaint in the Commission against the State.[1] Ms. Hood, who was a student at the University of Tennessee at Knoxville ("UTK") and a resident of the dormitory there known as South

_____
[1] Because UTK is an arm of the State, we will refer to the defending party generally as "the State."

Carrick Hall ("Carrick"), stated that on April 16, 2019, at approximately 1:00 p.m., she "slipped and fell in a puddle of liquid believed to be water and/or cleaning solution" upon entering the tile hallway of her dormitory suite. Ms. Hood averred that the puddle of liquid was created when a UTK housekeeping employee had cleaned the bathroom before Ms. Hood entered and had failed to remove any excess liquid from the floor. Ms. Hood stated that no signage warning of the condition was present even though the floor was unusually slippery. Ms. Hood suffered a broken arm as a result of her fall.

Ms. Hood claimed that UTK had breached its duty to her to keep the premises in a safe condition and to warn her of a latent defect. According to Ms. Hood, UTK had created the dangerous condition by (1) failing to adequately inspect or maintain the premises, (2) installing flooring that did not meet minimum safety standards for slip resistance, and (3) failing to place signage or otherwise warn her of the dangerous condition. Ms. Hood averred that because of UTK's negligence, she sustained injury to her right humerus, which required surgery and several months of rehabilitation and care. Ms. Hood sought an award of damages in the amount of $300,000.00.

The State filed an answer on November 22, 2019, denying that any negligence had occurred. On July 1, 2021, the State filed a motion for summary judgment, asserting that there existed no genuine issues of material fact and that the State was entitled to judgment as a matter of law. The State averred that the housekeeper assigned to Ms. Hood's dormitory suite, Angelia Hardy, had stated in her deposition that she did not clean the bathroom for Ms. Hood's suite until at least 2:15 to 2:30, after her afternoon break, as was her daily routine. Ms. Hardy also stated that she always left the housekeeping cart in the hallway while she was cleaning. Because Ms. Hood testified that she fell at approximately 1:00 p.m. and that she had seen neither Ms. Hardy nor the cleaning cart, the State asserted that the puddle could not have been caused by Ms. Hardy. In addition, although Ms. Hood stated that she had only been in her room for approximately fifteen minutes before entering the bathroom hallway, Ms. Hardy testified that it took her approximately twenty minutes to clean the bathroom. Moreover, Ms. Hardy explained that she always knocked on the door and announced, "housekeeping," before entering the suite.

In support of its motion for summary judgment, the State filed a statement of undisputed facts, and Ms. Hood filed a response to the motion and the statement of undisputed facts. Ms. Hood concomitantly filed a statement of additional undisputed material facts, including that (1) none of Ms. Hood's suite mates were present from the time she returned to her room until after the time she fell; (2) Ms. Hood was watching television and did not hear Ms. Hardy announce her presence; (3) the entire floor of the suite bathroom was wet when Ms. Hood fell; (4) the liquid on the floor smelled like cleaning solution; (5) Ms. Hardy testified that mopping the floor was the last task she would accomplish before moving on to the next room; (6) Ms. Hardy stated that cleaning

a bathroom would take twenty minutes "tops"; and (7) Ms. Hardy stated that after mopping the floor, she would leave the floor to dry on its own.

Following the filing of an additional response by the State, the Commission entered an order on November 5, 2021, denying summary judgment upon finding that genuine issues of material fact existed precluding summary judgment. Thereafter, Ms. Hood filed a motion to amend her complaint to seek compensatory damages in the amount of $282,398.23.[2]

On May 1, 2023, the Commission entered a judgment in favor of Ms. Hood, following a bench trial conducted on January 11, 2023, wherein Ms. Hood and her mother were the only live witnesses. The Commission also received and considered evidence via deposition from Ms. Hardy and Ms. Hood's treating physician. In its judgment, the Commission found that it maintained subject matter jurisdiction in this matter pursuant to Tennessee Code Annotated § 9-8-307(a)(1)(C) and that such jurisdiction was not in dispute.

The Commission found that Ms. Hood had "sustained an injury to her right arm on April 16, 2019, in her dormitory suite bathroom." The Commission noted Ms. Hood's testimony that on that day, she had attended a class, left class, proceeded to a fast-food restaurant to get her lunch, and then returned to her dormitory suite at "around 1:15." Upon returning to her suite, Ms. Hood was the only person there. When she entered, she crossed the tile floor leading to the bathroom in her tennis shoes, observed no puddle or water on the floor, and did not slip. The Commission found that Ms. Hood did not spill anything on the floor or otherwise cause the floor to be wet. The Commission further found that besides the four residents of the suite, no one other than UTK custodial staff would have reason to be present in the suite's bathroom.

The Commission determined that after Ms. Hood arrived in her room, she ate her lunch and watched television for a period of "probably 15 or 20 minutes." Ms. Hood testified that she was watching television and using earphones and that the door to her bedroom was closed. According to Ms. Hood, she then went outside her door, barefoot, to the outer bathroom area of the suite, where the floor was "completely wet," and immediately slipped and fell, catching herself with her arm. Ms. Hood testified that the bathroom was "completely saturated and it had a strong smell of cleaning solution as if the housekeeper was there." Ms. Hood stated that she had not smelled this odor in the bathroom area when she initially returned from class. Ms. Hood also testified that her clothes were wet from her fall and that she felt the need to change into dry clothes before being transported to the hospital. Ms. Hood was admitted to the emergency room at Fort Sanders Hospital at 1:54 p.m.

---

[2] The Commission granted this motion to amend at the beginning of trial.

The Commission found that the bathrooms on Ms. Hood's floor in Carrick were cleaned on Tuesdays, according to Ms. Hardy's testimony, and that this event occurred on a Tuesday. Although Ms. Hood did not see the housekeeper or a cart on the day in question, she testified that it was common to not see the cleaning cart when housekeeping was cleaning the floor. The Commission fully credited Ms. Hood's version of the events of that day, including that if Ms. Hardy had knocked on the outer door, Ms. Hood would not have heard the knock.

The Commission determined that Ms. Hood had suffered a broken arm, requiring surgery and the placement of plates and screws. Ms. Hood then underwent physical therapy, and she continued exercises and rehabilitation at home for approximately four months. Because of her injury, Ms. Hood missed the last two weeks of her freshman year at UTK and had to seek accommodations from her professors. The Commission further found that Ms. Hood incurred reasonable medical expenses totaling $47,398.23 as a result of her injury and that she had continuing soreness and aching in the arm as well as loss of range of motion.

The Commission noted that Ms. Hardy was not deposed for approximately two years following the incident and that she could not remember exactly when she learned about Ms. Hood's fall, although she stated that it was approximately "a month after it occurred." Ms. Hardy testified regarding her normal procedure for cleaning the dormitory bathrooms, including the fact that mopping the floor was the last task she completed before moving on to the next bathroom. She acknowledged that she did not utilize any type of signage after mopping the floor to warn of its wet condition and that she left the floor to dry on its own. The Commission therefore found that Ms. Hood had no warning that the floor had been mopped and was "wet all over."

The Commission noted that Ms. Hardy had testified that she typically began her cleaning of the Carrick bathrooms on the opposite end of the hall from where Ms. Hood's room was located, such that she would have reached Ms. Hood's bathroom after cleaning ten or eleven other bathrooms. Ms. Hardy stated that she typically began cleaning around 9:20 a.m. and that it would take her "twenty minutes tops" to clean each one. Weighing the testimony of Ms. Hood and Ms. Hardy, the Commission credited Ms. Hood's specific timeline of events on the day in question rather than Ms. Hardy's testimony based on her "habit and routine." The Commission thus determined that Ms. Hardy had cleaned the bathroom and left the floor wet and that Ms. Hood had no warning of this condition. Based on the facts, the Commission concluded that Ms. Hardy was negligent and that her negligence was the proximate cause of Ms. Hood's injuries and damages. The Commission also concluded that Ms. Hardy had created a dangerous condition on State-controlled property that presented a foreseeable risk to Ms. Hood.

Based on the testimony of Ms. Hood's treating physician, the Commission determined that Ms. Hood had suffered a broken humerus as the result of her fall,

resulting in necessary surgical intervention and physical therapy. The Commission found that the treatment Ms. Hood received was both reasonable and necessary to her recovery. The Commission therefore awarded to Ms. Hood damages for medical expenses, pain and suffering, permanent injury to her arm, scarring and disfigurement, and loss of enjoyment of life totaling $187,398.23. The State timely appealed.

## II. Issues Presented

The State presents the following issues for this Court's review, which we have restated slightly:

1.      Whether the Commission erred when it determined that Ms. Hardy had created a puddle of water in which Ms. Hood slipped and fell.

2.      Whether the Commission erred in awarding damages to Ms. Hood in the amount of $187,398.23.

## III. Standard of Review

This Court has previously explained the appropriate standard of review for a final judgment of the Tennessee Claims Commission:

> Except where otherwise provided, "[t]he decisions of the individual commissioners or, when rendered, decisions of the entire commission regarding claims on the regular docket may be appealed to the Tennessee court of appeals pursuant to the same rules of appellate procedure which govern interlocutory appeals and appeals from final judgments in trial court civil actions." Tenn. Code Ann. § 9-8-403(a)(1) (Supp. 2009). Accordingly, we review the Commission's findings of fact and conclusions of law pursuant to Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Bowman v. State*, 206 S.W.3d 467, 472 (Tenn. Ct. App. 2006) (citation omitted). The Commission's factual findings receive a presumption of correctness and will not be overturned unless the evidence preponderates to the contrary. *Id*. (citing *Beare Co. v. State*, 814 S.W.2d 715, 717 (Tenn. 1991); *Dobson v. State*, 23 S.W.3d 324, 328-29 (Tenn. Ct. App. 1999); *Sanders v. State*, 783 S.W.2d 948, 951 (Tenn. Ct. App. 1989)). The Commission's legal conclusions are reviewed *de novo* with no presumption of correctness. *Id*. (citing *Turner v. State*, 184 S.W.3d 701, 704 (Tenn. Ct. App. 2005); *Crew One Productions, Inc. v. State*, 149 S.W.3d 89, 92 (Tenn. Ct. App. 2004); *Belcher v. State*, No. E2003-00642-COA-R3-CV, 2003 Tenn. App. LEXIS 827, 2003 WL 22794479, at *4 (Tenn. Ct. App. Nov. 25, 2003)).

*Atkinson v. State*, 337 S.W.3d 199, 204-05 (Tenn. Ct. App. 2010). "We accord great deference to the Claims Commission's determinations on matters of witness credibility and will not re-evaluate such determinations absent clear and convincing evidence to the contrary." *Cavaliere v. State*, No. M2021-00038-COA-R3-CV, 2022 WL 320241, at *2 (Tenn. Ct. App. Feb. 3, 2022) (quoting *Skipper v. State*, No. M2009-00022-COA-R3-CV, 2009 WL 2365580, at *2 (Tenn. Ct. App. July 31, 2009)).

## IV. Preponderance of the Evidence

This action was filed pursuant to Tennessee Code Annotated § 9-8-307(a)(1)(C) (Supp. 2023), which provides that the State can be sued based on certain acts or omissions of its employees, including:

> Negligently created or maintained dangerous conditions on state controlled real property. The claimant under this subdivision (a)(1)(C) must establish the foreseeability of the risks and notice given to the proper state officials at a time sufficiently prior to the injury for the state to have taken appropriate measures[.]

Tennessee Code Annotated § 9-8-307 (Supp. 2023) also contains the following pertinent provisions:

> (c)    The determination of the state's liability in tort shall be based on the traditional tort concepts of duty and the reasonably prudent person's standard of care.

> (d)    The state will be liable for actual damages only. No award shall be made unless the facts found by the commission would entitle the claimant to a judgment in an action at law if the state had been a private individual[.]

As this Court has previously explained regarding the proper interpretation of the above-quoted statutory provisions:

> From the usual and ordinary meaning of the words of this statute, we believe that T.C.A. § 9-8-307(a)(1)(C) removes the state's immunity to the same extent as the obligation of a private owner or occupier of land. In other words, for the purposes of determining the state's liability after removal of immunity, the statute merely codifies the common law obligation of the owner or occupier of land. Owners and occupiers of land have an obligation to exercise ordinary care and diligence in maintaining their premises in a safe condition for visitors upon the premises, and are under an affirmative duty to protect these persons against dangers of which

they know or which, with reasonable care, they might discover. *McCormick v. Waters*, 594 S.W.2d 385 (Tenn. 1980).

In *Jones v. Zayre, Inc.*, 600 S.W.2d 730 (Tenn. App. 1980), the Eastern Section of this Court said:

> Before an owner or operator of premises can be held liable for negligence in allowing a dangerous or defective condition to exist on its premises, it must have (1) been created by the owner or operator or his agent or, (2) if the condition was created by someone other than the owner or operator or his agent, there must be actual or constructive notice on the part of the owner or operator that the condition existed prior to the accident. *Gargaro v. Kroger Grocery & Baking Co.*, 22 Tenn. App. 70, 118 S.W.2d 561 (1938).

600 S.W.2d at 732.

In the case at bar, the state constructed the offending instrumentality and obviously must be charged with notice of its condition as constructed.

*Sanders v. State*, 783 S.W.2d 948, 951-52 (Tenn. Ct. App. 1989).

In the instant case, the State argues that Ms. Hood failed to prove that Ms. Hardy created the dangerous condition that caused Ms. Hood's injury. In support of this argument, the State relies upon *Robbins v. Memphis Little Theatre Players*, No. 02A01-9601-CV-00018, 1997 WL 585743, at *1 (Tenn. Ct. App. Sept. 23, 1997), wherein this Court affirmed the trial court's grant of a directed verdict based on a lack of evidence that the defendant created the dangerous condition. The State argues that Ms. Hood's evidence regarding the creation of the dangerous condition, much like that of the plaintiff in *Robbins*, was too speculative to support the Commission's finding.

In *Robbins*, the plaintiff slipped on "something slick" and fell while descending a set of stairs inside a theater. *See Robbins,* 1997 WL 585743, at *1. After her fall, the plaintiff saw a crumpled theater program, which was printed on "slick" paper, lying on the step behind her. *Id.* The plaintiff therefore believed that she had slipped on the theater program and fallen. *Id.* With regard to the plaintiff's proof on this issue, the *Robbins* Court stated:

> While a jury is not permitted to speculate regarding two equally probable inferences, a plaintiff, to bring his case before the jury, need not produce evidence that excludes every other reasonable conclusion. *Benson v. H.G. Hill Stores, Inc.*, 699 S.W.2d 560, 563 (Tenn. App. 1985). The

plaintiff need only present proof which, if found credible, makes the plaintiff's theory more probable than that of the defendant. *Id*. Although the plaintiff's evidence is far from strong, it is sufficient for a jury to conclude that the crumpled theater program was the cause of Mrs. Robbins' fall.

*Id*. at *3.

In order to prevail on her negligence claim, however, the *Robbins* plaintiff was also required to prove that "an employee of the Theatre either caused the dangerous condition by dropping the program or had actual or constructive notice of its presence." *Id*. ("In a premises liability action where the plaintiff has been injured by a dangerous condition, he must prove either that the defendant had actual or constructive knowledge of the condition or that the defendant caused the condition." (citing *Keene v. Cracker Barrel Old Country Store*, 853 S.W.2d 501, 503 (Tenn. Ct. App. 1992))). Because the plaintiff presented no proof demonstrating that the theater had notice of the presence of the program on the stairs, and because it was equally plausible that the program could have been dropped by a patron as well as by an employee of the theater, this Court affirmed the trial court's grant of a directed verdict in the theater's favor, determining that there was "no evidence that it was more likely than not that the dangerous condition was caused by the defendant." *Robbins*, 1997 WL 585743, at *4.

In contrast to *Robbins*, our review of the evidence in the case at bar leads us to conclude that Ms. Hood did provide the Commission with evidence that it was more likely than not that the dangerous condition of the wet tile floor was caused by the State's employee. Ms. Hood testified that at the time of her injury, she was residing in Carrick with a roommate and two additional suite mates. Regarding the configuration of the suite, Ms. Hood explained that there was an entry door from the main dormitory hallway that opened to an interior, tiled foyer with a toilet on the right side and a shower on the left. After passing through this foyer/bathroom area, one would come to two interior doors, with each door opening to a bedroom containing two beds. It is undisputed that Ms. Hardy cleaned the bathroom in Ms. Hood's suite on the date in question, including mopping the tile floor; however, the State asserts that Ms. Hardy's testimony via deposition proves that she could not have cleaned the bathroom before Ms. Hood returned during lunch or while she was in her room. We disagree.

Ms. Hood related that she attended class on the morning in question and that her class ended at 12:25 p.m. Ms. Hood then walked to a fast food restaurant to pick up lunch. Ms. Hood reported that her walk to the restaurant would have lasted around fifteen minutes, her time in the restaurant was around twenty minutes, and her walk back to her room in Carrick took another fifteen minutes, placing her back in her room at approximately 1:15 p.m. According to Ms. Hood, upon entry to the foyer area of her suite, she did not notice the tile floor being slippery or wet and also did not smell any

odor of cleaning fluid. Ms. Hood was wearing regular, rubber-soled tennis shoes when she arrived at the suite.

Ms. Hood stated that she proceeded to enter her bedroom, where she sat in a chair and ate her lunch while watching television. Ms. Hood estimated that she ate lunch for fifteen to twenty minutes before exiting her bedroom to go to the restroom and entering the tiled foyer area where she fell. Ms. Hood was barefoot at that time. Ms. Hood testified that when she stepped onto the tile floor, she slipped and fell, catching herself with her right arm. She described the tile floor as "completely wet," "saturated," and having "a strong smell of cleaning solution as if the housekeeper was there." According to Ms. Hood, the smell was exactly the same as she had smelled on previous occasions when the bathroom had been cleaned. Ms. Hood had not smelled this odor upon her initial entry into the suite.

Ms. Hood related that she was the only person in her suite when she returned from class that morning. Although she acknowledged that her suite mates had access to the suite, she explained that they were in class at that time and did not return to the suite until after she had gone to the hospital. Ms. Hood stated that she had not spilled any liquid on the floor on the day in question.

Ms. Hood articulated that although did not see or hear the housekeeper enter the suite while she was there, she had her bedroom door closed, which was a thick, wooden door, and she was using earphones while watching television. Ms. Hood further stated that she kept her bedroom door closed because sometimes the outer door did not lock properly. Ms. Hood also indicated that she did not see the custodial cart, but she explained that she typically did not see the cart when the housekeeper was cleaning. She also testified that the housekeeper often failed to clean the bathroom thoroughly and would frequently omit tasks.

Ms. Hood testified that following her fall, her clothes were extremely wet from the liquid on the tile floor such that she felt she needed to change before going to the hospital. She also stated that she knew her arm was broken and that she texted a friend to take her for medical care. Ms. Hood was transported to Fort Sanders Hospital and acknowledged the accuracy of the time on her intake form of 1:54 p.m.

In contrast to Ms. Hood's testimony relating the specific timeline of events on the day in question, Ms. Hardy, the State employee, testified only concerning what was her normal daily routine for cleaning the bathrooms in Carrick. Ms. Hardy acknowledged that she did not learn about Ms. Hood's fall until approximately one month after it occurred, and she did not report having a memory of any specific details from the day of the incident. Ms. Hardy testified that she cleaned the bathrooms on Ms. Hood's floor on Tuesday; Ms. Hood's fall occurred on a Tuesday. Ms. Hardy related that she normally started on the opposite end of the hall with the resident advisor's room and worked her

way down the hall, such that Ms. Hood's room would have been one of the last that she cleaned for the day. Based on this routine, she stated that she would not have cleaned Ms. Hood's bathroom until after her 2:00-2:15 p.m. break. Ms. Hardy admitted, however, that the resident advisor sometimes asked Ms. Hardy to skip her room and return to clean it at the end of the day.

Regarding the time spent cleaning each bathroom, Ms. Hardy first testified that she spent twenty minutes "tops" in each bathroom. However, Ms. Hardy later indicated that she never spent less than twenty minutes cleaning a bathroom. According to Ms. Hardy, mopping the floor was the final task she performed before moving on to the next bathroom and leaving the floor to air dry. Ms. Hardy acknowledged that at the time of the incident, she did not place a "wet floor" sign in the bathroom after mopping although she had been instructed to do so after the accident. Ms. Hardy further acknowledged that she always used a specific cleaning solution, provided by her employer and mixed with water, in her mop bucket.

We reiterate that the "Commission's factual findings receive a presumption of correctness and will not be overturned unless the evidence preponderates to the contrary." *Atkinson*, 337 S.W.3d at 204. "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *In re Estate of Ladd*, 247 S.W.3d 628, 637 (Tenn. Ct. App. 2007).

Having thoroughly reviewed the record in this matter, we conclude that the evidence does not preponderate against the Commission's factual findings. Although some of the evidence presented was circumstantial, defined as "proof of collateral facts and circumstances from which the existence of the main fact may be deduced according to reason and common experience of mankind," *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975), we note that "direct and circumstantial evidence is equally relevant and equally probative." *McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 825 (Tenn. Ct. App. 2005) (quoting NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[5], at 4-10 (4th ed. 2000)).

We further note that "[t]he weight, faith and credit to be given to any witness's testimony lies in the first instance with the trier of fact. The credibility accorded will be given great weight by the appellate court." *Estate of Hargett v. Brown*, No. M2022-00250-COA-R3-CV, 2023 WL 3916273, at *7 (Tenn. Ct. App. June 9, 2023) (quoting *Hollar v. Hollar*, No. M2014-02370-COA-R3-CV, 2015 WL 7748967, at *3 (Tenn. Ct. App. Nov. 30, 2015)). With regard to testimony provided via deposition, our Supreme Court has clarified:

> In contrast, appellate review of documentary proof, such as depositions or other forms of testimony presented to the trial court in a 'cold' record, differs considerably. When reviewing documentary proof, all

impressions of weight and credibility are drawn from the contents of the evidence, and not from the appearance of witnesses and oral testimony at trial. As a result, appellate courts may make an independent assessment of the credibility of the documentary proof it reviews, without affording deference to the trial court's findings.

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783-84 (Tenn. 1999) (citations omitted).

Although Ms. Hood neither saw nor heard Ms. Hardy enter the suite or clean the bathroom, she explained that she was in her bedroom, with the door closed, watching television while using headphones. She also testified that the liquid on the tile floor that caused her to slip smelled of cleaning fluid and that the odor was exactly the same as the odor she smelled after the housekeeper had cleaned the bathroom on prior occasions. Moreover, Ms. Hood had not smelled this odor upon her initial entry into the suite on that day. Based upon our independent review of the evidence, we agree with the Commission's determination that Ms. Hood's testimony should be given more weight concerning the timing of events on the day in question because it was detailed and specific, whereas Ms. Hardy's testimony related only to what was her normal routine.

With respect to the time Ms. Hardy spent cleaning the bathroom, Ms. Hardy's testimony was somewhat contradictory regarding whether she spent twenty minutes "tops" in the bathroom or whether she never spent less than twenty minutes. However, Ms. Hood opined that she had spent fifteen to twenty minutes in her bedroom eating, which was a sufficient amount of time for the cleaning to occur, especially considering Ms. Hood's testimony that certain cleaning tasks in the bathroom were often omitted. Accordingly, we conclude that the evidence preponderates in favor of the Commission's finding that Ms. Hardy's cleaning of the bathroom left the tile floor in a dangerous condition for which Ms. Hood had no warning and that such condition was the cause of Ms. Hood's fall.

## V. Amount of Damages Awarded

Having determined that the Commission properly concluded that the State should be held liable for Ms. Hood's damages, we now turn to the second issue raised by the State on appeal: whether the amount of damages awarded to Ms. Hood was in error. The State argues that the non-economic damages awarded—$45,000 for pain and suffering; $45,000 for permanent injury; $20,000 for scarring/disfigurement; and $30,000 for loss of enjoyment of life—were excessive and should be reduced on appeal. As this Court has previously explained:

Where a trial court hears a case without a jury, we review the amount of damages awarded by the trial court as a question of fact with a presumption

of correctness, and will only alter or amend the amount if the trial court utilized the wrong measure of damages or when the evidence preponderates against the amount of damages awarded.

*Eagles Landing Dev., LLC v. Eagles Landing Apartments, LP*, 386 S.W.3d 246, 250 (Tenn. Ct. App. 2012) (quoting *Smith v. Williams*, No. E1999-01346-COA-R3-CV, 2000 WL 277059, at 4 (Tenn. Ct. App. March 15, 2000)).

Concerning the types of non-economic damages awarded in this case, this Court has explained: "Damages for pain and suffering include both the physical and mental discomfort caused by an injury." *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380, 388 (Tenn. Ct. App. 2006). Permanent injuries are injuries "from which the plaintiff cannot completely recover" and which "prevent[] a person from living his or her life in comfort by adding inconvenience or loss of physical vigor." *Palanki*, 215 S.W.3d at 388 (quoting *Overstreet v. Shoney's*, 4 S.W.3d 699, 715 (Tenn. Ct. App. 1999)). "Disfigurement is a specific type of permanent injury that impairs a plaintiff's beauty, symmetry, or appearance." *Id.* Finally, "[d]amages for loss of enjoyment of life compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life." *Palanki*, 215 S.W.3d at 388-389 (quoting *Overstreet*, 4 S.W.3d at 715-16).

Here, Ms. Hood testified that she suffered a fracture of her humerus that required surgical intervention as well as months of continued rehabilitation and therapy. Ms. Hood described the significant pain that she experienced both at the time of her injury and for some time thereafter, which affected her ability to perform daily tasks and to participate in and enjoy her college classes and other activities. This testimony was supported by that of Ms. Hood's mother, who explained that for weeks following the accident, she had to help her daughter bathe, dress, use the restroom, brush her hair, and accomplish many other tasks. She stated that Ms. Hood also had trouble sleeping for some time after the accident due to the pain. According to Ms. Hood's mother, Ms. Hood was "devastated" about having to miss many of the social occasions surrounding the end of her freshman year of college. Ms. Hood also had to be escorted back and forth to UTK to complete class work and exams.

Ms. Hood further testified regarding her ongoing loss of range of motion as well as pain and weakness in the affected arm even though her treating physician was pleased with her recovery. Ms. Hood detailed a continuing ache in the injured arm and demonstrated her inability at the time of trial to fully straighten it. She further demonstrated to the Commission both the significant bruising and swelling that she experienced immediately after the injury, as shown in photographic evidence, and the scar that remained after her surgery.

Having thoroughly reviewed the evidence presented, we conclude that the Commission did not utilize the wrong measure of damages when crafting the award. *See Eagles Landing Dev.*, 386 S.W.3d at 250. We further conclude that the evidence does not preponderate against the amount of damages awarded. *See id.* We accordingly affirm the amount of damages awarded by the Commission in this matter.

## VI. Conclusion

For the foregoing reasons, we affirm the Commission's judgment in its entirety. Costs on appeal are assessed to the State of Tennessee. This case is remanded to the Commission for enforcement of the judgment and collection of costs assessed below.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE