# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### January 20, 2011 Session Heard at Memphis

## JAN OGLESBY and JOHN OGLESBY v. EDWIN T. RIGGINS

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-001027-08     D.J. Alissandratos, Special Judge**

---

### No. W2010-01470-COA-R3-CV - Filed March 17, 2011

---

This case arises from a car accident in which Appellant was injured when her vehicle was struck by Appellee's vehicle. Following a jury trial, the jury awarded Appellant damages, including $100,000 for Appellant's loss of earning capacity claims. Acting as the thirteenth juror, and based upon its finding that Appellant had failed to meet her burden to show loss of earning capacity, the trial court suggested remittitur of the entire $100,000 loss of earning capacity award. Appellant appeals. Discerning no error, we affirm.

### Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Donald A. Donati and William B. Ryan, Memphis, Tennessee, and D. Briggs Smith Batesville, MS, for the appellants, Jan Oglesby and John Oglesby.

Garrett M. Estep, Memphis, Tennessee, for the appellee, Edwin T. Riggins.

### OPINION

Jan Oglesby is married to John Oglesby ("Plaintiffs" or "Appellants").[1] At all relevant times, Mrs. Oglesby was both an employee and a part-owner of Gulliver's Travel Poplar Avenue. Gulliver's Travel Poplar Avenue is the holding company for two retail locations in Memphis, Gulliver's Travel Wolfchase (a/k/a Gulliver's Travel Germantown) and Gulliver's Travel Oak Court. At the time of the hearing, Gulliver's Travel Poplar Avenue owned one hundred percent of Gulliver's Travel Oak Court and sixty-five percent of

---

[1] Although Mr. Oglesby is listed as an Appellant on the Notice of Appeal, we note that he has raised no issue concerning his loss of consortium claim.

Gulliver's Travel Wolfchase. Gulliver's Travel was started by the Bagatelas family in Illinois and has been in business for over thirty years. After opening an agency in Memphis in 1984, Todd Bagatelas hired Mrs. Oglesby as a sales person. Mrs. Oglesby excelled in that position and soon became a driving force in the success of the business. Consequently, Mrs. Oglesby was offered an ownership interest in the holding company in 1987 or 1988. Since that time, she has owned fifty percent of Gulliver's Travel Poplar Avenue. As part-owner, Mrs. Oglesby's income is derived from the sales, and specifically the commissions paid on the sales, of both retail locations; however, Mrs. Oglesby works out of the Oak Court location.

Mrs. Oglesby's specialty is group trips, which she began putting together in the 1980s. Over the years, Mrs. Oglesby has developed a devoted clientele and has escorted many trips. As Mrs. Oglesby explained in her testimony, she researches the trips and puts together an itinerary for the group. She then sells the trip (usually soliciting her repeat clients first). While traveling with the groups, Mrs. Oglesby testified that, depending on the group makeup, she performed many tasks. On some trips with elderly clients, Mrs. Oglesby assisted them with their luggage and with walking. On other trips, with more nimble clientele, Mrs. Oglesby testified that she would lead the group in hiking and other more adventurous undertakings. The group trips account for approximately fifty percent of the total revenue earned by Gulliver's Travel Oak Court.

On Thursday, April 12, 2007, Jan Oglesby was on her way home from work at Gulliver's Travel Oak Court when her vehicle was struck from behind by a vehicle driven by Appellee Edwin T. Riggins. The record indicates that Mrs. Oglesby was traveling South on Colonial Road, and was stopped with her left turn signal on, waiting for traffic to clear so that she could turn left onto Spottswood Avenue. Kimberly Smith, a witness to the accident, testified that she (i.e., Mrs. Smith) was driving North on Colonial, and that she saw Mr. Riggins' vehicle approaching, but that it did not appear that he engaged his brakes prior to hitting Mrs. Oglesby's vehicle.

As a result of the collision, Mrs. Oglesby testified that she experienced pain in her left shoulder and neck, as well as contusions to her head, knees, and chest. Although Mrs. Oglesby did not seek medical attention at the time of the accident, she testified that, beginning the day after the wreck, her whole body was sore and hurting. Based upon her symptoms, Mrs. Oglesby went to her physician on Monday, April 16, 2007, and explained that she had been in a car accident the previous Thursday. At the time of that visit, she was complaining of pain in her left shoulder and neck. Dr. Bill Bourland prescribed physical therapy for Mrs. Oglesby's neck, and referred Mrs. Oglesby to Dr. David Deneka, an orthopedic specialist, for her left shoulder. Dr. Deneka testified that he diagnosed Mrs.

Oglesby with left rotator cuff strain and impingement of the rotator cuff.[2]  Mrs. Oglesby's left shoulder was treated with medication, physical therapy, home exercises, and steroid injections.

For her neck injuries, Dr. Deneka referred Mrs. Oglesby to Dr. Michael Sorenson, who specializes in physical medicine and rehabilitation with an emphasis in interventional spine care.  Dr. Sorenson began treating Mrs. Oglesby in November of 2007, and diagnosed her with a cervical neck strain with disk protrusion.  Upon physical examination, Dr. Sorenson noted that Mrs. Oglesby had reduced range of motion in her neck and that she exhibited pain and tenderness in her neck.  Dr. Sorenson recommended medication and continued physical therapy.

On or about February 22, 2008, the Oglesbys filed a complaint against Mr. Riggins in the Shelby County Circuit Court, alleging that Mr. Riggins was negligent in the operation of his vehicle, and that this negligence caused the Oglesbys to suffer damages.  On or about March 3, 2008, the Oglesbys filed an amended complaint alleging the following damages,: (1) past present, and future mental and physical pain and suffering; (2) permanent physical impairment; (3) injuries requiring past, present, and future medical treatment; (4) past, present, and future medical expenses; (5) loss of enjoyment of life; (6) wage and benefits loss; and (7) any other damages available in law or equity, including out-of-pocket expenses and post-judgment interest.  Mr. Oglesby also claimed loss of consortium.  Mr. Riggins filed his answer on April 2, 2008.  Also, in order to recover under their uninsured/underinsured motorist coverage, the Oglesbys served a copy of their amended complaint on their automobile insurance carrier, which filed its answer on April 4, 2008.

Following discovery, a jury trial was held on April 5th through April 7th, 2010.  The jury unanimously found that Mr. Riggins was at fault, and awarded Mrs. Oglesby damages in the amount of $157,626.35 and Mr. Oglesby $3,000 on his loss of consortium claim.  Specifically, the jury awarded $15,000 for past pain and suffering; $15,000 for future pain and suffering; $0 for permanent impairment; $10,000 for past loss of enjoyment of life; $10,000 for future enjoyment of life; $7,626.35 for medical expenses;  $40,000 for loss of past earning capacity, and $60,000 for loss of future earning capacity.  The Oglesbys also moved for, and were awarded, $8,493.60 in discretionary costs against Mr. Riggins.

On April 16, 2010, Mr. Riggins filed a post-trial motion, seeking to alter or amend, or in the alternative, for remittitur of the portion of the verdict relating to damages for loss of earnings both past (i.e., $40,000) and future (i.e., $60,000).  The Oglesbys' insurance

---

[2] The record indicates that, prior to the accident, Mrs. Oglesby had undergone surgery on her right rotator cuff, and had also had carpal tunnel surgery.

company also joined in Mr. Riggins' motion. On April 21, 2010, the Oglesbys filed a response opposing Mr. Riggins' motion.

On April 26, 2006, the trial court entered an order granting Mr. Riggins' post-trial motion and suggesting remittitur in the amount of $100,000, which consisted of Jan Oglesby's $40,000 award for past loss of earnings and $60,000 award for future loss of earnings. On May 6, 2010, Mrs. Oglesby filed a notice of acceptance of remittitur under protest. Final judgment was entered by the trial court on May 21, 2010. The Oglesbys filed a timely notice of appeal, and raise two issues for review, as stated in their brief:

> 1. Whether the trial court erred in suggesting a remittitur of the jury's award of $40,000 to Jan Oglesby for past loss of earnings based on speculation and passion even where the Defendant/Appellee acknowledged that Mrs. Oglesby had sustained some past economic losses.
>
> 2. Whether the trial court erred in failing to follow the principles set forth in *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694 (Tenn. Ct. App. 1999) in suggesting a remittitur of the jury's $60,000 award to Jan Oglesby for future loss of earning capacity based on the fact that the jury did not award Mrs. Oglesby any money for permanent impairment, as well as speculation and passion.

As discussed by this Court in *Grandstaff v. Hawks*, 36 S.W.3d 482 (Tenn. Ct. App. 2000):

> In personal injury cases, calculation of damages is within the province of the jury. *See Lunn v. Ealy*, 176 Tenn. 374, 376, 141 S.W.2d 893, 894 (1940). Nevertheless, the trial court may suggest remittitur of a verdict if the court finds that the verdict is excessive. *See* Tenn. Code Ann. § 20-10-102(a) (1994). If the party in whose favor the verdict has been rendered refuses to make the remittitur, the trial court must grant a new trial. *See City of Gatlinburg v. Fox*, 962 S.W.2d 479, 481 (Tenn. 1998). If, however, the party accepts the remittitur under protest, the party may then appeal the trial court's finding that the verdict was excessive. *See* Tenn. Code Ann. § 20-10-102(a); *City of Gatlinburg v. Fox*, 962 S.W.2d at 481.
> Trial courts should suggest remittitur if it would

accomplish justice between the parties without the cost and delay inherent in a new trial. *See Turner v. Jordan*, 957 S.W.2d at 823; *Thrailkill v. Patterson*, 879 S.W.2d 836, 840 (Tenn. 1994). If possible, the courts should utilize the remedy of remittitur, rather than ordering a new trial based on the size of the jury verdict. *See Thrailkill v. Patterson*, 879 S.W.2d at 840; *United Brake Sys., Inc. v. American Envtl. Prot., Inc.*, 963 S.W.2d 749, 760 (Tenn. Ct. App. 1997).

*Grandstaff*, 36 S.W.3d at 499.

Regarding remittitur of a jury verdict, statutory provisions outline the authority of both the trial court and this Court. Tennessee Code Annotated § 20-10-102 provides, in relevant part, as follows:

> (b) The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury. If, in the opinion of the court of appeals, the verdict of the jury should not have been reduced, but the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment shall be rendered in the court of appeals for the full amount originally awarded by the jury in the trial court.

Tenn. Code Ann. § 20-10-102(b) (2009).

Tennessee Rule of Appellate Procedure 13(d) states that "review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." However, conclusions of law are not afforded the same presumption. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

In *Long v. Mattingly*, 797 S.W.2d 889 (Tenn. Ct. App. 1990), Judge, now Justice, Koch succinctly explained the role of appellate courts in reviewing a trial court's suggestion of remittitur on a jury verdict:

The role of the appellate courts is to determine whether the trial court's adjustments were justified, giving due credit to the jury's decision regarding the credibility of the witnesses and due deference to the trial court's prerogatives as thirteenth juror....

The contours of the scope of appellate review have changed over the years. Now, the appellate courts customarily conduct a three-step review of a trial court's adjustment of a jury's damage award. First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. Second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.

If, after reviewing the record, we determine that the adjusted damage award is still excessive, we have the prerogative under Tenn. Code Ann. § 20-10-103(a) (Supp.1989) to reduce the damages further.

*Love v. Mattingly*, 797 S.W.2d at 896 (citations omitted). Under *Love*, the three-step approach applicable to this Court's review of a trial court's suggestion of remittitur is as follows: (1) first, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380 (Tenn. Ct. App. 2006) (citing *Love*, 797 S.W.2d at 896); *see also* *Burlison v. Rose*, 701 S.W.2d 609, 611 (Tenn. 1985); (2) second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. *Love,* 797 S.W.2d at 896; *see also* *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 148 (Tenn.1981);[3] *Guess v. Maury*, 726 S.W.2d 906, 913 (Tenn. Ct. App.1986); (3) third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment. *See* Tenn. Code Ann. § 20-10-102(b).

_____

[3] We note that the trial court's suggestion of remittitur in this case did not "totally destroy" the jury's verdict. Rather, after remittitur of the loss of earning capacity awards, the jury's verdict was reduced to $57,626.35, plus discretionary costs. Mr. Oglesby's award for loss of consortium was also undisturbed. At oral argument, Ms. Oglesby's attorney stated that she was not raising an appellate issue concerning whether the trial court's suggestion of remittitur destroyed the jury's verdict.

Keeping the foregoing principles in mind, we turn to the record. In reaching its decision on the suggestion of remittitur, the trial court made the following statements from the bench, which statements were included, by reference, in the court's order of April 26, 2010:

> Having heard all the evidence as a 13[th] juror, I must tell you that the Plaintiff's allegations of past loss of earnings and future loss of earnings, in this Court's opinion, w[ere] purely speculative. There is no better word to more accurately describe it.
>
> The Court understands the jury's verdict and when the jury says that there... was zero permanent impairment, the Court then has to take a look at...if there's zero permanent impairment, how can you have loss of future earning? Even if it is speculative.
>
> ... I am going to suggest a remittitur of the $60,000 for loss of future earnings to be removed and that also [for] the loss of past earnings of $40,000.
>
> \*                              \*                              \*
>
> I realize that this case has had a lot of emotion to it, but I must tell y'all this as plainly as I can: Socrates said the law is reason devoid of passion....
>
> ... I listened carefully to th[is] case. All the proof that the Plaintiff had on this point [] rested upon passion. It was not [based] upon the kind of reason that this Court could say is logical. This Court did allow the jury to go ahead and hear this matter. I probably, on reflection, should not have allowed certain testimony in.
>
> But my job is not to be sympathetic to one side or the other in a sense of ruling...my job is to follow the law....
>
> And when I follow the law in this matter, I cannot intellectually and honestly say that the Plaintiffs have presented sufficient evidence that a reasonably prudent person sitting as a juror could come to the conclusion that there is sufficient evidence in the record to render the verdict that they rendered. And that's my opinion as the 13[th] juror.

Under ***Love*** and ***Palanki, supra***, our first inquiry is "simply to ascertain whether the trial judge's actions in increasing or decreasing a verdict were justified, giving due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his or her capacity as thirteenth juror." *See also* ***Burlison v. Rose***, 701 S.W.2d 609, 611 (Tenn. 1985) (citing ***Foster v. Amcon Int'l, Inc.***, 621 S.W.2d 142, 145 (Tenn. 1981)). While the amount of the verdict is primarily for the jury to determine, the trial judge who presided at the trial and heard the evidence is the next most competent person to pass upon the matter. ***Id***. (citing ***Transports, Inc. v. Perry***, 220 Tenn. 57, 414 S.W.2d 1, 5 (1967)). In short, we must first review the trial court's motives for reducing this verdict and whether those motives are supported by the record. As set out above, the trial court concluded that there was insufficient evidence to support any finding of loss of earnings, either past or future, and that the jury's award of those damages was based purely upon sympathy and passion. In fact, in its order, *supra*, the trial court opines that the issue of loss of earnings should never have reached the jury. Our first inquiry, therefore, is whether the evidence preponderates in favor of the trial court's finding that there was insufficient evidence to establish that Mrs. Oglesby actually suffered any loss of earnings. Before reviewing the evidence, we first pause to discuss the applicable law on loss of earning capacity.

As set out in 29 Am. Jur. 3d <u>Proof of Lost Earning Capacity</u> §6 (1995):

> Assuming the plaintiff has established the foundation case for liability against the tortfeasor, the elements of proof necessary to establish the claim for loss of earning capacity as an element of damage are as follows:
>
> 1. Proof of the existence of some earning capacity—either actual or potential—prior to the injury;
> 2. Proof that this earning capacity has been lost or diminished;
> 3. Proof that the cause of the lost or diminished earning capacity is proximately caused by the injury; and
> 4. Proof of the dollar amount of the loss.

***Id***. (footnotes omitted)

Concerning the element of proximate cause, 29 Am. Jur. 3d <u>Proof of Lost Earning Capacity</u> §11 (1995) cautions:

> Usually there is little or no difference in the proof necessary to establish the case for damages generally and the elements necessary to establish damages for loss of earning

capacity.... Sometimes, however, there is a difference, and careful analysis is required to make sure that the proof will be complete. It is essential for counsel to bear in mind the necessity of proving two separate proximate-cause linkages in the case [of lost earning capacity]: one between the tortfeasor's actions and the injury sustained for the general case on liability, and a second, separate proximate-cause linkage between the injury sustained and the loss or impairment to the injured party's capacity to earn a living for the damage case on loss of earning capacity.

The general rule is that where the physical impairment can be objectively ascertained, and where its connection to impairment of earning capacity is obvious or ascertainable from other evidence, then separate medical testimony is not required to establish the elements of proximate cause between impairment and earning capacity....

Where, however, the physical impairment is obscure or subjective, or where the connection between the physical impairment and earning capacity is not obvious, then expert medical testimony may be essential. In such cases, there must be competent medical testimony that the physical condition suffered by the plaintiff, and which was proximately caused by the occurrence in suit, is a substantial factor in impairing the party's ability to earn. The expert witness so testifying must indicate that the opinions given are held to a reasonable degree of medical certainty (or a reasonable degree of medical probability), and that the opinions and connections are not mere speculation, conjecture or possibility. A failure to establish the link by competent testimony, to the degree of proof required, may result in the evidence being excluded, or the verdict overturned on appeal.

*Id*. (footnotes omitted).

The question of loss of earning capacity, both past and future was discussed by this Court in *Overstreet v. Shoney's Inc.*, 4 S.W.3d 694 (Tenn. Ct. App. 1999). In *Overstreet*, we concluded that the plaintiff's claim for diminished earning capacity was not speculative because she was employed as a registered nurse and had demonstrated the ability to advance in the nursing profession. In so ruling, we noted that:

The party seeking damages has the burden of proving them.... In tort cases, the proof of damages need not be exact or mathematically precise.... Rather, the proof must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the damages....

Damages may never be based on mere conjecture or speculation.... However, uncertain or speculative damages are prohibited only when the existence, not the amount, of damages is uncertain... Evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty.

Loss or impairment of future earning capacity is an element of damages in a personal injury action.... Earning capacity refers not to actual earnings, but rather to the earnings that a person is capable of making....

The extent of an injured person's loss of earning capacity is generally arrived at by comparing what the person would have been capable of earning but for the injury with what the person is capable of earning after the injury.... If the injury is permanent this amount should be multiplied by the injured person's work life expectancy, and the result should be discounted to its present value.... [fn. 1 states that "[d]amages for impairment of earning capacity may be awarded for either permanent or temporary impairments....]

The injured party has the burden of proving his or her impairment of earning capacity damages.... In order to recover these damages, the injured person must first prove with reasonable certainty that the injury has or will impair his or her earning capacity.... Then, the injured party must introduce evidence concerning the extent of the impairment of his or her earning capacity.

The proof concerning impairment of earning capacity is, to some extent, speculative and imprecise.... However, this imprecision is not grounds for excluding the evidence....

The courts have found competent and admissible any evidence which tends to prove the injured person's present earning capacity and the probability of its increase or decrease in the future.... Thus, the courts have routinely admitted evidence concerning numerous factors, including the injured person's age, health, intelligence, capacity and ability to work,

-10-

experience, training, record of employment, and future avenues of employment....

***Overstreet v. Shoney's Inc.***, 4 S.W.3d 694, 703-704 (Tenn. Ct. App. 1999).

Moreover, as noted in 29 Am. Jur. 3d <u>Proof of Lost Earning Capacity</u> §5 (1995), fact finders must distinguish between impaired physical capacity and impaired earning capacity. They are not necessarily the same:

> Proof of impaired physical ability is not always equivalent and therefore not always sufficient to prove impaired capacity to earn. Depending upon an individual's skill, education, training or experience, a severe physical disability may make no difference at all to one individual's capacity to earn while an otherwise trivial injury may make a significant difference to another....
>
> A careful analysis of the circumstances of each case is necessary. [One] cannot assume that significant physical injuries alone will be sufficient to establish an entitlement to damages for loss of earning capacity, nor should [one] overlook this element in cases of what may otherwise appear to be trivial or minor injuries.

***Id.*** *See also* ***Potts v. Mississippi Dept. of Transp.***, 3 So. 3d 810 (Miss. Ct. App. 2009) (holding that motor vehicle passenger's evidence of loss of earning capacity was speculative; therefore, she failed to establish any damages for loss of earning capacity in personal injury action in which she allegedly sustained injury to her right knee (passenger never presented any concrete evidence regarding her loss of earning capacity, and treating physician did not place any work restrictions on passenger)).

Based upon the foregoing principles, and especially in light of the ***Overstreet*** holding, the issue of the amount of damages is secondary to the issue of the existence of the damages, which must be caused by the underlying tort. In this case, the trial court did not reach the issue of the amount of damages because it concluded that Mrs. Oglesby failed to show the existence of any loss of earning capacity. We now turn to the record to determine whether the evidence preponderates against this finding. Because the sole issue before this Court is Mrs. Oglesby's claim for loss of past and future earning capacity, we will focus our discussion on those portions of the evidence that are relevant to this issue.

-11-

**Medical Treatment**

Mrs. Oglesby was treated by Dr. Deneka for her left shoulder injury and by Dr. Sorenson for her neck injury. Dr. Deneka testified that Mrs. Oglesby reported to him, in October of 2008, that she was unable to go on trips because of the pain in her left shoulder. Dr. Deneka noted pain upon range of motion and difficulty with any sort of lifting. As of October 2008, Dr. Deneka opined that Mrs. Oglesby would have continued trouble with her left shoulder, and that she would likely need intermittent pain injections at the site going forward. As of October 6, 2008, Dr. Deneka stated that Mrs. Oglesby had reached maximum medical improvement regarding her shoulder, and he assigned her a 5 percent permanent impairment rating as a result of the left shoulder injury. Specifically, Dr. Deneka opined that Mrs. Oglesby would have limitation with overhead lifting, and that she would probably not be able to lift more than twenty-five pounds.

Concerning Mrs. Oglesby's neck injury, after her initial visit to Dr. Sorenson in November 2007, Mrs. Oglesby did not see Dr. Sorenson again until April of 2008. At that time, Mrs. Oglesby continued to report neck pain, in addition to her shoulder pain, and informed Dr. Sorenson that she had been unable to escort trips due to the pain. Dr. Sorenson's physical examination revealed reduced cervical range of motion and pain and tenderness. Dr. Sorenson recommended additional therapy and medication. Although Dr. Sorenson explained that Mrs. Oglesby had degenerative changes in her neck, he stated that her neck had been asymptomatic before the accident. Mrs. Oglesby next saw Dr. Sorenson in the summer of 2008, when she again complained of neck pain and reduced range of motion. Dr. Sorenson gave Mrs. Oglesby a pain injection and saw her again on September 29, 2008. At that time, Dr. Sorenson recommended continued physical therapy, but opined that Mrs. Oglesby had reached her maximum medical improvement. Dr. Sorenson assigned Mrs. Oglesby a 5 percent permanent impairment rating as a result of her neck injury. Mrs. Oglesby saw Dr. Sorenson again on December 1, 2008, and he performed another injection at that time.

Dr. Sorenson testified that Mrs. Oglesby should perform physical activities as tolerated, but noted that strenuous activities would likely aggravate her neck pain. Specifically, Dr. Sorenson opined that bending the neck back to look up, and any type of lifting (especially overhead), would aggravate her neck. Dr. Sorenson stated that Mrs. Oglesby would more likely than not continue to need anti-inflammatories.

Although both Dr. Deneka and Dr. Sorenson were aware that Mrs. Oglesby traveled extensively in connection with her job at Gulliver's Travel, neither doctor restricted Mrs. Oglesby from traveling, either during her treatment or after her release from their respective care. In addition, although both doctors opined that Mrs. Oglesby suffered a five percent

permanent impairment, the jury did not agree because it found zero permanent impairment and awarded no damages on that claim. We note, however, that the principle underlying recovery for lost earning capacity is the same whether the impairment is permanent or only temporary. *See* ***Dingus v. Cain***, 406 S.W.2d 169, 171 (Tenn. Ct. App. 1966); ***Southern Coach Lines, Inc. v. Wilson***, 214 S.W.2d 55, 56 (Tenn. Ct. App. 1948).

## The Effect of Mrs. Oglesby's Injuries on her Ability to Perform her Job

At trial, Mrs. Oglesby testified that she was still experiencing pain in her neck and left shoulder. She described the pain as "chronic," and stated that she uses pain patches and over-the-counter medication to deal with the pain. Mrs. Oglesby, and her husband, testified that, prior to the accident, Mrs. Oglesby had been very physically active, both in her personal and professional life. At the trial, Mrs. Oglesby asserted that she sustained a loss of income as a result of the accident. As noted above, her job with Gulliver's Travel is to plan, sell, and lead group travel all over the world. Mrs. Oglesby asserts that, because of the accident, she is unable to take as many group trips as she did before the accident, and that trips not taken equal missed sales opportunities, as well as additional business expenses, and, consequently, loss of income. The record, however, fails to support this claim.

Mrs. Oglesby specializes in group travel. Before the accident, she averaged five to eight trips per calendar year. After the accident, she allegedly averaged three trips per calendar year. However, the record indicates that, in the twelve months immediately following the accident, from April 2007 through March 2008, Mrs. Oglesby actually took six trips: (1) China (April 2007, eight days); (2) Russia (June 2007, eleven days); (3) Egypt (September 2007, nine days); (4) Thailand (October 2007, eleven days); (5) South Africa (January 2008, twelve days), and (6) South America (March 2008, thirteen days). Of these six trips, Mrs. Oglesby only required an assistant for the first trip to China. Linda Blaydes, a Gulliver's Travel agent, testified that she accompanied Mrs. Oglesby on the China trip. Although Mrs. Oglesby claims that the inclusion of Ms. Blaydes in this trip resulted in loss of income to the business (and to Mrs. Oglesby as a part-owner), the record indicates that, at the time of the China trip, Ms. Blaydes was in training to sell group trips, and was beginning to travel with groups. Moreover, Ms. Blaydes testified that Mrs. Oglesby allegedly missed two trips after the accident, one to Budapest, and another "wine cruise" from Vancouver to San Diego. One of Mrs. Oglesby's theories at trial was that Gulliver's Travel had lost repeat business because Mrs. Oglesby was unable to sell upcoming trips while traveling with loyal clientele. Mrs. Oglesby testified that, anytime she goes on a trip with a group, she arranges a cocktail hour so that she can talk about upcoming trips and, hopefully, obtain commitments for these upcoming ventures from the travelers at that time. However, when asked whether Gulliver's Travel had lost any business in relation to these missed trips, neither Ms. Blaydes, nor Mrs. Oglesby could elaborate. Moreover, there was no testimony

introduced from any client who had declined to schedule travel through the agency because Mrs. Oglesby could not travel. Although the record indicates that Mrs. Oglesby took six trips (or approximately the same number of trips that she took pre-accident) in the year after her accident , the jury found that Mrs. Oglesby's ability to travel had been limited, to some degree, by her injuries. This finding appears to be the basis for the jury's award of damages for loss of earning capacity in this case. Specifically, the jury found that, if Mrs. Oglesby's ability to travel was affected, then her ability to sell was, likewise, affected. However, as discussed below, it is not the number of trips, or even the number of sales, that reflect Mrs. Oglesby's true earnings; rather, it is the amount of the commissions paid on those sales.

Mrs. Oglesby is one of several travel agents that work for Gulliver's Travel. Gulliver's Travel earns income through receipt of commissions paid by its vendors (i.e., hotels, airlines, tour group operators, etc.) and clients. Some of the agents are paid hourly rates plus a percentage of the commissions earned, while other agents are paid only a percentage of the commissions earned. It is important to note that Mrs. Oglesby is neither paid by the hour, nor paid a direct percentage of the commissions on her personal sales. As part-owner of Gulliver's Travel Poplar Avenue, Mrs. Oglesby's income is tied to the profits and losses of both retail locations. At trial, Mrs. Oglesby explained the payment structure as follows:

> Q. Would you agree with me, Mrs. Oglesby, that your personal income, as a whole, is directly tied to Gulliver's Travel, both locations, rather than just your own personal commissions?
>
> A. My personal commissions goes–is in the whole company. Right.
>
> *       *       *
>
> Q. So your personal income is tied to the business as a whole?
>
> A. Correct.
>
> *       *       *
>
> Q. And you don't get a direct dollar, dollar percentage commission on every trip you sell because it goes back into the whole, correct?
>
> A. Absolutely. Correct.

Although there was testimony that, in some years, Mrs. Oglesby received a salary from Gulliver's Travel, she did not draw a salary if the company profits did not provide the necessary income. For example, in 2009, Gulliver's Travel did not make enough profit for Mrs. Oglesby to receive her salary. In fact, she testified that she made a decision not to take a full salary so that the company would not have to lay off any of its agents. Although Mrs. Oglesby's overall earnings necessarily decreased based upon her decision to forego her draw (i.e., her salary is essentially a draw against anticipated profits of the business, and is based upon her 50 percent ownership interest in the holding company), this decrease was not, from the record, a direct result of Mrs. Oglesby's inability to work. Rather, the record reveals that numerous factors affect Gulliver's Travel and its ability to make a profit. As the testimony reveals, these factors include, but are not limited to, the economy, increased expenses, decreased commissions paid by vendors, the productivity of its agents, competition, and the increased use of internet travel sites. In her testimony, Mrs. Oglesby conceded that these, and other factors, play a substantial role in the revenues and profits of Gulliver's Travel. Todd Bagatelas, one of Mrs. Oglesby's partners and the accountant for the agency, also testified that the foregoing factors have affected the company's overall profits.

The car accident occurred on April 12, 2007. Because Gulliver's Travel's trips are generally booked and paid in advance, the year 2007 was typical for Mrs. Oglesby and for Gulliver's Travel. We note that the fiscal year for Gulliver's Travel runs from October 1 to September 30. A comparison of the company's fiscal years for 2007, 2008, and 2009 was prepared by Mr. Riggins' accounting expert, Dr. Parker Cashdollar, and was introduced at trial as Exhibit 22. The following information combines the figures for both retail locations, and provides as follows:

<u>TOTAL SALES AND COMMISSIONS OF GULLIVER'S TRAVEL</u>

|             | 2007        | 2008        | 2009        |
|-------------|-------------|-------------|-------------|
| Sales       | $7,053,677  | $5,482,071  | $4,353,981  |
| Commissions | $826,638    | $679,836    | $547,866    |

The testimony at trial also revealed that the total number of travel agents working at Gulliver's Travel decreased over these years. In 2007, there were thirty-six agents working; in 2008, there were twenty-eight agents; and in 2009, there were twenty-seven. Consequently, and according to Dr. Cashdollar's calculations, from 2007 to 2009, Gulliver's Travel's total sales to clients decreased by $2,699,696 (or approximately 38 percent). The total revenue from commissions earned by Gulliver's Travel decreased by $278,772 (or approximately 34 percent), and the number of sales agents generating income decreased by nine (or 25 percent). Obviously, the overall profits of Gulliver's Travel decreased during these years. Mrs. Oglesby contends that these decreases show a loss of earnings. While we

concede that the decrease in overall income of Gulliver's Travel necessarily affects Mrs. Oglesby's income as a 50 percent owner of the company, the issue is whether this decrease in overall income was a result of Mrs. Oglesby's inability to generate her usual sales, commissions, and income because of injuries sustained in the car accident. The answer hinges upon the evidence introduced regarding Mrs. Oglesby's personal sales and commissions during the relevant time period.

Trial Exhibit 22 sets out Mrs. Oglesby's sales and commissions during the 2007 through 2009 fiscal years:

|                          | 2007      | 2008      | 2009      |
|--------------------------|-----------|-----------|-----------|
| Jan Oglesby's Sales      | $615,440  | $457,869  | $384,669  |
| Jan Oglesby's Commissions| $78,140   | $82,052   | $79,424   |

As set out above, Mrs. Oglesby's overall sales decreased by approximately 37 percent from 2007 to 2009. This is consistent with the decrease in overall sales at Gulliver's Travel of approximately 38 percent. However, it is her commissions that provide income to the business. As noted above, Mrs. Oglesby's commissions actually remained steady (and, in fact, increased slightly) over the relevant time period. Again, it is undisputed that overall company sales were affected by various factors during the years 2007 through 2009. As a result of the decrease in the profits of Gulliver's Travel, Mrs. Oglesby's income did decline dramatically from 2007 to 2009, both in absolute amounts and as a percentage of personal commissions earned. Specifically, in 2007, Mrs. Oglesby's income was $101,000 (or 129.26 percent of her total commissions); in 2008 her income was $64,081 (or 78.10 percent of her total commissions), and in 2009 (the year in which Mrs. Oglesby chose to forego her full salary in order to retain her employees) her income was $15,385 (or 19.37 percent of her total commissions). However, based upon the fact, as set out in Trial Exhibit 22, *supra*, that Mrs. Oglesby's commissions remained steady, despite the overall decline in the company's profits, we are unable to conclude that there is any direct or substantial correlation between the commissions she personally generated for Gulliver's Travel and her decreased income derived from the business as a whole.

At the hearing, Mrs. Oglesby did not testify concerning her own personal loss of earning capacity claim. Rather, she relied upon her husband, John Oglesby, to calculate her alleged loss. Mr. Oglesby testified that a direct correlation exists between Mrs. Oglesby's commissions earned and her personal income. Mr. Oglesby's testimony appears to rest upon the proposition that Mrs. Oglesby receives 50 percent (as part-owner) of every dollar she receives in commission. As stated in the Oglesbys' brief:

After expenses are deducted, for every $100 generated on these

> trips, Mrs. Oglesby would receive $50. Thus, the three trips [per year] that Mrs. Oglesby will [allegedly] miss going forward results in a 50 percent loss of income [per trip] to Mrs. Oglesby....

This proposition, however, is not supported by the record. As discussed above, Mrs. Oglesby does not, necessarily, receive 50 percent of her own commissions; rather, her income is derived from the total commissions and profits (minus expenses) generated by Gulliver's Travel Poplar Avenue (which amount hinges upon the overall performance of both retail locations). So, for example, in 2009, although Mrs. Oglesby's commissions were in line with previous years, she did not draw a salary in order to avoid terminating employees. Consequently, she was not generating commissions as income for herself, but to keep her agents employed and the business open. In her testimony, Mrs. Oglesby admitted that her commissions go into the whole business along with the commissions of the other employees. Mr. Bagatelas confirmed that Mrs. Oglesby receives a share of the overall profits.

Mrs. Oglesby allegedly lost commissions by being unable to travel and, therefore, being unable to sell future vacations while on her current trips, and this is what the jury found. However, from the number of trips Mrs. Oglesby took in the year following the accident, it does not appear that Mrs. Oglesby was rendered unable to travel by her injuries. Rather, the evidence establishes that Mrs. Oglesby can and does, in fact, travel. Concerning her ability to sell future trips while on current trips, Mrs. Oglesby admitted that she can and does sell group travel after the accident. Moreover, no customer testified that he or she did not take or book a trip because Mrs. Oglesby was unable to lead the trip after her accident. Consequently, there is no competent evidence, medical or otherwise, to show that Mrs. Oglesby cannot travel or otherwise sell group travel trips after the accident. Although Mrs. Oglesby may not have traveled as frequently in the calendar years following the accident, the record does not show a causal relationship between this fact and the accident. Rather, the decline in overall sales is consistent with the decline in the business as a whole. And, more importantly, Mrs. Oglesby's commissions remained steady despite the overall decline in the travel business.

Based upon the record as a whole, we conclude that the trial court did not err in finding that Mrs. Oglesby failed to meet her burden to show a meritorious loss of earning capacity claim for either past or future lost earnings. We, therefore, do not reach the question of the amount of damages.

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellants, Jan Oglesby and John Oglesby, and their surety.

_____
J. STEVEN STAFFORD, JUDGE