

FILED

04/25/2017

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
February 27, 2017 Session

## SUZANNE BISHOP WEST v. EPIPHANY SALON & DAY SPA, LLC

**Appeal from the Circuit Court for Hamilton County**
**No. 12C1476      L. Marie Williams, Judge**

_____

### No. E2016-01860-COA-R3-CV

_____

This appeal concerns a jury award of damages in a negligence case.  Suzanne Bishop West ("West") sued Epiphany Salon & Day Spa, LLC ("Epiphany") in the Circuit Court for Hamilton County ("the Trial Court") for damages resulting from a facial she received that burned her face.  Epiphany conceded liability and the matter went before a jury for a determination of damages.  The jury awarded West $125,000 in damages.  Epiphany filed a motion for remittitur.  The Trial Court, finding the award excessive, reduced the award from $125,000 to $47,800.  West appeals to this Court, asking that we restore the original jury award of $125,000.  Finding no reversible error, we affirm the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and THOMAS R. FRIERSON, II, JJ., joined.

Thomas H. O'Neal and Jeffrey D. Boehm, Chattanooga, Tennessee, for the appellant, Suzanne Bishop West.

Mary C. DeCamp and James F. Exum, III, Chattanooga, Tennessee, for the appellee, Epiphany Salon & Day Spa, LLC.

# OPINION

## Background

On January 12, 2012, West, owner of a boutique clothing store in Chattanooga, went to Epiphany to receive a facial treatment. West's Mother had given her a gift certificate for the service. West's face began burning upon application of the treatment. West rushed home in pain.

In December 2012, West sued Epiphany in the Trial Court for damages to her face resulting from Epiphany's alleged negligence. In January 2013, Epiphany filed its answer. In May 2016, Epiphany filed its amended answer in which it conceded liability. This left only the issue of damages to be determined by a jury. Trial was held over the course of two days in July 2016.

West testified to the impact the facial had upon her as follows:

Q. Why did you file this lawsuit?
A. Primarily because my face never improved, and that's why I waited as long as I did to file because I kept hoping and hoping that the damage from the facial would get better and it didn't, and that's why I filed the lawsuit.
Q. Tell the jury how this incident that happened to you on January 12, 2012, this facial, has affected your life over the last four and a half years.
A. Well, other than looking in the mirror every day and seeing the damage from the facial. I mean, major lifestyle changes. It takes a lot longer for me to do my makeup every morning to cover everything. You know, appointments with attorneys, appointments with doctors, painful laser treatments, purchasing of multiple products, thousands of dollars of products trying to experiment with what covers a brown spot, what covers rosacea, what covers hyperpigmentation, what covers, you know, multiple marks on my face and, you know. I mean, it's totally changed my life, and I felt like I had to.

West testified to $6,605 worth of products she had used since the incident to try to remedy the redness and marks on her face. According to West, her life had changed in that she now had to wear a higher SPF sunscreen, a hat, and big sunglasses in the sun. West also stated that she now spent half an hour putting on makeup each morning.

Dr. Rodney Susong, a dermatologist who treated West, testified as an expert for West. West had undergone three laser treatments on her face. The total cost of Dr.

Susong's medical treatment for West was approximately $2,008. Dr. Susong testified to West's treatment as follows:

Q. If you can recall, when did you first see her?
A. I saw her I think March 13th of 2012.
Q. All right. And what history did you take from her as to why she was wanting to see you?
A. She came to me because she had had a reaction to a chemical peel, I think which was given in January of that year, four to six weeks prior to her visit. And she had noticed that her face peeled and it burned after its application, and she was concerned about the resulting effect on her skin.
Q. Whether from chemical burns, fire burns, sunburns, was it unusual for you to see and treat the condition that she presented with?
A. Well, we treat, you know, any sort of injury to the skin in which -- that we have the ability to do so.
Q. Okay.
A. Some injuries require, you know, surgical intervention. So if you have a burn, for example, and the burn goes deeply, then you're going to need surgical intervention. For burns or any kind of injury that's superficial, then we usually treat those.
Q. All right. Did you examine Ms. West?
A. I did. I saw her.
Q. What was your impression of the severity of her condition?
A. What I saw was that she had some redness, she had some broken capillaries. She had a few freckles. She had no textural changes.
Q. Okay.
A. Okay? Which is good, because that means the tissue itself had not been harmed to the degree that it left a permanent disfigurement in relationship to the texture.
Q. Okay. Now, the, the blood vessel fractures that you, you talked about, are they under the skin?
A. They are.
Q. And, all right. Tell us whether or not one can visualize them in -- through the skin of the patient.
A. Well, you can see a redness to the skin, which is -- many people have redness to the skin. In addition, you can also see the little lines that run across the skin. Some are shaped like tree limbs and some are shaped like a matting, like an intertwining of an edge or a mat. We call it matting. You can also see it with magnification, which is what we use in the office.
Q. Now, what are the cardinal signs of inflammatory reaction from a chemical burn?

A. Well, there's going to be initially some pain with redness. Tissue can be harmed in some way in the sense that it gets red, swollen. If the injury is of sufficient degree, then it can blister. So it's like a sunburn. If you have a sunburn and it's mild, you get red and you burn, you sting. If the sunburn is worse, then you what; you blister because the damage goes deeper.

Q. All right, sir. And what was your assessment of the condition of her skin?

A. Well, I felt like that she was fortunate that she did not have textural changes. I think she had redness, which we had hoped that would resolve over time.

Q. And has it resolved over time?

A. Only to a certain degree. Once you get a blood vessel that's formed, unfortunately it's more difficult to deal with. It's like a spider vein on your leg. If you get a spider vein on your leg, there is no real cream sometimes that can help them.

***

Q. Is there any way, Dr. Susong, for you to predict what will happen to this, this lady's facial skin in the future?

A. I think it depends on -- you know, hopefully she stays out of the sun; and as best she can try to avoid anything that typically can make it worse.

Q. All right. And if she does stay out of the sun and doesn't do anything to aggravate it, what do you expect will happen to her?

A. It depends on the patient.

Q. Okay.

A. Some people are fortunate that their redness can persist at a given level and it stays that way. Those are the lucky ones. And some people it will worsen. And one can never predict exactly which way it's going to go.

After the trial, the jury found that West had proven by a preponderance of the evidence that she was entitled to damages of $125,000. In July 2016, Epiphany filed a motion for remittitur or, in the alternative, a new trial. In August 2016, the Trial Court entered an order granting Epiphany's motion and suggesting a remittitur, which West accepted under protest in order to appeal. The Trial Court, in its detailed order suggesting remittitur, stated the following, in relevant part:

> In this case, Plaintiff presented proof at trial in support of her claims for both economic and non-economic damages resulting from a facial she received in January of 2012.

-4-

**Economic Damages:**

Plaintiff presented proof at trial concerning two categories of economic damages. First, Plaintiff presented proof of medical expenses incurred following the incident. Plaintiff's dermatologist, Dr. C. Rodney Susong, testified about these expenses and reviewed a list of medical expenditures provided to him by Plaintiff's counsel. In review of this list, Dr. Susong testified that Plaintiff made eight office visits to his office at a cost of $165 each, totalling $1,320 in all. Additionally, Dr. Susong testified that Plaintiff underwent three separate laser treatments at $150 each, totalling $450 for all three. Finally, Dr. Susong testified that he prescribed Plaintiff Noritate at the cost total cost of $237.99. Plaintiff's medical expenditures presented at trial totalled approximately $2,008. According to Dr. Susong, there is no recommended future treatment.

In addition to medical expenses, Plaintiff also presented proof of various products she has purchased for her face over the course of four and a half years between the incident and the time of trial. Plaintiff submitted, as Exhibit 7 at trial, a list stating each product, the purpose of the product, the quantity purchased, and the cost per unit. The total cost for all of the products on the list was $6,605. At trial, Plaintiff testified that four of the products on the list were products that she was already purchasing prior to the incident. These four products accounted for approximately $2,300. The list also included the Noritate that was prescribed to Plaintiff by Dr. Susong and included in the calculation of medical expenses. The plaintiff testified she used the Noritate only once. Excluding these products from the list, the amount spent on the remaining products on the list totals approximately $4,067. Further, with the exception of the Noritate, Cetaphil, and Cera Ve, there was no testimony at trial that any of the other products on the list were recommended by a medical professional or that Plaintiff would continue to purchase any or all of these products into the future. Finally, there was no proof that any of the products on the list helped improve the condition of Plaintiff's face.

Even accepting the total cost represented in the products list and combining it with the medical expenses discussed by Dr. Susong, the maximum amount of economic damages that could be supported by the proof would be approximately $8,613. In other words, economic damages account for only around 7% of jury verdict awarded to Plaintiff.

**Non-Economic Damages:**

In considering non-economic damages, the jury was permitted to consider past physical pain and suffering, past mental suffering, disfigurement, and loss of enjoyment of life.

Past Physical Pain and Suffering:

With regard to past physical pain and suffering, the majority of the proof came from Plaintiff's testimony. Plaintiff testified that after receiving the facial, she felt a painful burning sensation on her face for three to four hours. Additionally, Plaintiff testified that the three laser treatments she underwent were painful. She described the laser treatments as like having rubber bands snapped on her face for thirty to forty-five minutes. There was no claim for future pain and suffering.

Past Mental Suffering:

The jury was also permitted to consider past mental suffering, which the jury charge defined as including "anguish, grief, shame, or worry." In support of the claim that she suffered mentally as a result of the incident, Plaintiff testified that she did not go to many work and social events during the first two years following the incident. However, this testimony was largely neutralized by pictorial evidence of Plaintiff engaged in a variety of social and work activities throughout that time period, countering her testimony about how concerned she was about her appearance. The only other proof possibly relating to mental suffering was testimony by Plaintiff's mother that Plaintiff was very proud of her skin and always took care of it growing up. There simply was very little evidence to support an award of damages based on past mental suffering.

Disfigurement:

In calculating non-economic damages, the jury was permitted to consider disfigurement, which the jury charge defined as "a specific type of permanent injury that impairs a person's beauty, symmetry or appearance." Dr. Susong testified that there was no textural damage to Plaintiff's face and that the redness on Plaintiff's face went from moderate to mild as a result of the three laser treatments. He further testified that the rosacea may go away over time but that there is no way to tell for sure. Dr. Susong did state that the skin cannot be returned to the original state and that the dilation of Plaintiff's facial capillaries is permanent. He also noted that as a

person ages, spots can develop on the person's skin, which one can reasonably assume would require makeup to conceal. Dr. Susong never saw Plaintiff's face prior to the incident, except in pictures provided to him by Plaintiff.

Additionally, Tish Jackson, an esthetician, testified as to the condition of Plaintiff's face. Ms. Jackson testified that Plaintiff had perfect skin prior to the incident. Ms. Jackson also noted that the capillary damage is permanent but that it would be very hard to say what the future damage may be.

Importantly, both Dr. Susong and Ms. Jackson were using special devices that use bright light and magnification so that they could observe details of the Plaintiff's skin that would likely be unviewable to the naked eye. Plaintiff testified that she was not wearing any makeup during the trial. The Court had the opportunity to sit next to Plaintiff as Plaintiff testified, and the Court was unable to identify any disfigurement.

While the proof indicates that there is some permanent damage to Plaintiff's facial capillaries, this damage is not readily apparent to the naked eye. There was no testimony that any such damage cannot be fully concealed by application of makeup. Further, Plaintiff is 41 years of age. As Dr. Susong acknowledged, a person's skin changes as the person get older. Plaintiff is entitled to some damages due to disfigurement, however, the jury verdict award is grossly disproportional to the injury sustained.

Loss of Enjoyment of Life:

Finally, the jury was permitted to consider damages for loss of enjoyment of life, which the jury charge defined as taking into account "the loss of the normal enjoyments and pleasures in life in the future as well as limitations on the person's lifestyle resulting from the injury." At trial, Plaintiff testified that she has experienced a "total lifestyle change" after the incident. However, the only changes are that Plaintiff now spends 30 minutes every morning applying makeup, that she has to wear a higher SPF sunscreen, sunglasses, and a hat when spending time out in the sun. Plaintiff did testify that before the incident she only wore makeup once or twice a month.

**Other Issues:**

The defense raises legitimate concerns about two separate interactions between Plaintiff's mother and one of Plaintiff's witnesses with jurors while the trial was ongoing. However, there is insufficient evidence to show that these interactions were clearly inappropriate contacts or that they had any effect on the verdict.

CONCLUSION

Based upon the credible proof presented at trial, the Court finds that the jury verdict award of $125,000 was excessive. Taking into account testimony and evidence concerning past physical pain and suffering, mental suffering, disfigurement, loss of enjoyment of life, and economic losses, including past medical expenses and facial product expenses, the Court finds that the upper limit of the range of reasonableness for a verdict award in this case is $47,800.

Therefore, the Court suggests a remittitur of $77,200 (61.8% of the jury verdict award), which, if accepted, will reduce the verdict amount to $47,800.

Plaintiff must now choose one of the following options: (1) accept the remittitur, (2) decline the remittitur and opt for a new trial, or (3) accept the remittitur under protest and seek relief from the Court of Appeals. *Meals* 417 S.W.3d at 422.

West timely appealed to this Court.

**Discussion**

Although not stated exactly as such, West raises one issue on appeal: whether the Trial Court erred in suggesting remittitur of the jury verdict from $125,000 to $47,800.

The standard of review where a trial court suggests a remittitur has been discussed thoroughly by this Court as follows:

The trial court's suggestion of remittitur is reviewed *de novo*, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 20-10-102 (2009); Tenn. R. App. P. 13(d). This Court should "determine whether the trial court's adjustments were justified, giving due credit to the jury's decision regarding the credibility of the witnesses and due deference to the trial court's prerogatives as thirteenth juror." *Johnson v. Nunis*, 383 S.W.3d 122,

134 (Tenn. Ct. App. 2012) (citing *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990)). As our Supreme Court has often explained:

> The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence.

*Foster v. Amcon Intern., Inc.*, 621 S.W.2d 142, 147 (Tenn. 1981) (quoting *Smith v. Shelton*, 569 S.W.2d 421 (Tenn.1978)). *See, e.g., Reeves v. Catignani*, 7 S.W.2d 38 (Tenn. 1928).

## IV. Remittitur

As this Court has previously recognized:

> The issue of damages is primarily for the jury. However, a trial court has the statutory authority to adjust the jury's award when necessary to accomplish justice between the parties and to avoid the expense of a new trial. This prerogative is codified in Tenn. Code Ann. § 20-10-102 (1994), which provides as follows:
>
> (a) In all jury trials had in civil actions, after the verdict has been rendered and on motion for a new trial, when the trial judge is of the opinion that the verdict in favor of a party should be reduced and a remittitur is suggested by the trial judge on that account, with the proviso that in case the party in whose favor the verdict has been rendered refuses to make the remittitur, a new trial will be awarded, the party in whose favor such verdict has been rendered may make such remittitur under protest, and appeal from the action of the trial judge to the court of appeals.
>
> (b) The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury. If, in the opinion of the court of appeals, the verdict of the jury should not have been reduced, but the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and

> judgment shall be rendered in the court of appeals for the full
> amount originally awarded by the jury in the trial court.

*Myers v. Myers*, No. E2004-02135-COA-R3-CV, 2005 WL 1521952 at *2-3 (Tenn. Ct. App. June 27, 2005) (internal citations omitted).

This statute recognizes the trial court's inherent power to suggest a remittitur and encourages the courts to utilize remittitur as a remedy to an excessive jury verdict in order to save the time and expense involved in granting a new trial. *See Thrailkill v. Patterson*, 879 S.W.2d 836, 840 (Tenn. 1994*); Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380, 386 (Tenn. Ct. App. 2006). In this case, the trial court suggested a remittitur rather than simply ordering a new trial. Such action indicates that the trial court agreed with the jury's verdict regarding liability and only disagreed with the amount of the jury's compensatory damages award. *See Myers*, 2005 WL 1521952 at *3 (citing *Burlison v. Rose*, 701 S.W.2d 609 (Tenn.1985)).

For over twenty years, our appellate courts have employed a "three-step review" when determining the propriety of a trial court's suggestion of remittitur:

> First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. Second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.

*Johnson*, 383 S.W.3d at 134 (citing *Long*, 797 S.W.2d at 896). This Court has made clear that "[t]he right to revise even the amount of the verdict by the process of suggesting a remittitur is a delicate one and one that a court should be slow to adopt...." *Palanki*, 215 S.W.3d at 387 (quoting *Jenkins v. Commodore Corp. S.*, 584 S.W.2d 773, 778 (Tenn.1979)).

*Adams v. Leamon*, No. E2012-01520-COA-R3-CV, 2013 WL 6198306, at **2-3 (Tenn. Ct. App. Nov. 25, 2013), *no appl. perm. appeal filed*.

Our analysis consists of three steps. First, with respect to the Trial Court's reasoning, the Trial Court gave extensive and detailed reasons for its decision to suggest

remittitur in its final judgment quoted above. It is clear that the Trial Court, while agreeing that West was entitled to certain damages for her injury, found the award rendered by the jury to be in excess of what the evidence supported. Specifically, the Trial Court found: "[T]he maximum amount of economic damages that could be supported by the proof would be approximately $8,613. In other words, economic damages account for only around 7% of jury verdict awarded to Plaintiff." The Trial Court stated further that: "Plaintiff testified that she did not go to many work and social events during the first two years following the incident. However, this testimony was largely neutralized by pictorial evidence of Plaintiff engaged in a variety of social and work activities throughout that time period, countering her testimony about how concerned she was about her appearance." The Trial Court also noted its own observation of West's face, stating: "The Court had the opportunity to sit next to Plaintiff as Plaintiff testified, and the Court was unable to identify any disfigurement." In these instances and more the Trial Court identified its reasoning for suggesting remittitur of the jury verdict. Taking into account the evidence in the record on appeal, we find the Trial Court's reasoning sound.

Second, regarding whether the suggested remittitur totally destroyed the jury's verdict, West makes no argument in her brief on appeal one way or another. At oral argument, Epiphany argued that even a 61.8% remittitur as in this case may not necessarily totally destroy the verdict. We are loathe to decide an issue that West did not even raise. However, we press on with the three-step remittitur analysis. Our Supreme Court has addressed what constitutes total destruction of a verdict as follows:

> The trial court's authority to suggest a remittitur of a jury's verdict rather than grant a new trial when it disagrees solely with the award of damages is not absolute. A suggested remittitur should not be so substantial as to destroy the jury's verdict. *See Foster v. Amcon Int'l, Inc.,* 621 S.W.2d 142, 148 (Tenn. 1981). There is no set percentage that represents the destruction of the jury's verdict. *See id*. at 148 n. 9 ("[W]e do not intend to establish a numerical standard for reviewing additurs and remittiturs."); *Webb v. Canada*, No. E2006-01701-COA-R3-CV, 2007 WL 1519536, at *4 (Tenn. Ct. App. May 25, 2007) ("While we decline to establish any particular percentage that would indicate a remittitur that has totally destroyed a jury verdict, we note that [large] remittiturs by percentage have been found acceptable by this Court and the Supreme Court of our state."). *Compare Webb*, 2007 WL 1519536, at *4 (citing cases in which remittiturs ranging from 40% to 59% were found to not destroy the jury's verdict), *with Guess v. Maury*, 726 S.W.2d 906, 913 (Tenn. Ct. App. 1986) (holding that 75% remittitur destroyed the verdict), *overruled on other grounds by Elliott*, 320 S.W.3d at 252, *and Myers v. Myers*, No. E2004-02135-COA-R3-CV, 2005

WL 1521952, at *1 (Tenn. Ct. App. June 27, 2005) (holding that 70% remittitur destroyed the verdict).

*Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420-21 n. 8 (Tenn. 2013).

As our Supreme Court explained, there is no precise number beyond which a jury verdict award is totally destroyed. In the present case, 61.8% certainly is a large reduction in the jury's verdict. Nevertheless, in the absence of any compelling argument from West—or, indeed, any argument at all—and, given the wide range in which even large remittiturs historically have been affirmed, we decline to find, without being requested to do so, that the jury's verdict was totally destroyed by the Trial Court's suggested remittitur.

Finally, in the third step of our analysis, we are tasked with deciding whether the evidence preponderates against the Trial Court's adjustment in light of the proof of damages. We find that the evidence as already discussed does not preponderate against the Trial Court's adjustment. We affirm the judgment of the Trial Court in its suggested remittitur of the jury verdict from $125,000 to $47,800.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded for collection of the costs below. The costs on appeal are assessed against the Appellant, Suzanne Bishop West, and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE